OPINION Raum, Judge: 1. Tarnation of Robinson's Share of Proceeds of Fight.- — Petitioner’s share of the proceeds of his fight with Basilio on September 23,1957, was $483,666.71, exclusive of motion-picture rights, and, by the end of 1957, his share in the proceeds of the sale of the motion-picture rights amounted to $32,516.74. As a result of the events described in our findings, he received or there was paid out in his behalf during 1957 in respect of that fight a total of $139,600, which he reported in his 1957 return. The Commissioner’s original determination of deficiency for 1957 charged him with omitting $344,066.71 (the difference between $483,666.71 and $139,600) “of the proceeds earned by you in the Bobinson-Basilio fight.”[1] And in an amended pleading the Commissioner claimed an additional deficiency attributable in part to Bobinson’s $32,516.74 share of the motion-picture proceeds for 1957. The problem relating to the taxation of petitioner’s earnings from the Basilio fight in 1957 arises solely by reason of the fact that he used the cash basis. If he were on an accrual basis the amounts charged to him by the Commissioner might well be includable in his 1957 income. But he was not on an accrual basis, and the question before us is whether the amounts that he had not in fact received in 1957 or that were not in fact paid out in his behalf in 1957 may nevertheless be treated as income to him in that year on a theory of constructive receipt or otherwise. The question is thus not whether the amounts in issue are taxable to petitioner, but when they are to be included in gross ineome. At the trial the Government’s position appeared to rest mainly upon constructive receipt, but in its brief it states as its “primary contention” that the Bobinson-Basilio fight was a “joint venture” in which petitioner was a participant, and that he is therefore taxable on his full distributive share, whether or not it was in fact distributed to him in that year. It argues alternatively that the deferred-payment contract was a sham, that it did not represent a binding arrangement between IBC and petitioner, that IBC would have paid petitioner in full immediately after the fight despite the deferred-compensation contract, and that petitioner is therefore chargeable with the full amount. It makes other alternative contentions that even if the deferred-payment contract is valid, petitioner should have reported greater amounts than the $139,600 appearing on his return, and that the service of notice of levy on IBC did not prevent petitioner’s realization of income in 1957 in accordance with his contractual arrangements. We reject all of these contentions. (a) Joint Venture. — Section 7701(a) (2) of the 1954 Code provides that the “term ‘partnership’ includes a * * * joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on * * *; and the term ‘partner’includes a member in such a * * * joint venture, or organization.” And of course, if there is a joint venture, the members, like partners, are chargeable with their respective distributive shares of the income of the joint venture, regardless of whether such income is in fact distributed to them. A joint venture has been defined in general terms to be a “special combination of two or more persons where, in some specific venture, a profit is jointly sought without any actual partnership or corporate designation” and “an association of persons to carry out a single business enterprise for profit.” Beck Chemical Equipment Corporation, 27 T.C. 840, 848-849; Estate of L. O. Koen, 14 T.C. 1406, 1409; Chase S. Osborn, 22 B.T.A. 935, 945. Whether a business undertaking entered into by two or more persons constitutes a joint venture depends largely on the terms of their contract and their actions in carrying out its provisions. As was noted in Hubert M. Luna, 42 T.C. 1067, 1077, “[wj'hether parties have formed a joint venture is a question of fact to be determined by reference to the same principles that govern the question of whether persons have formed a partnership which is to be accorded recognition for tax purposes. * * * Therefore, while all circumstances are to be considered, the essential question is whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise.” And the Court further pointed out that the “following factors, none of which is conclusive, bear on the issue” (pp. 1077-1078): The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties’ control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise. See also Lucia Chase Ewing, 20 T.C. 216, 231-232, affirmed on another issue 213 F.2d 438 (C.A.2); J. Roland Brady, 25 T.C. 682, 688; Wm. J. Lemp Brewing Co., 18 T.C. 586, 597; Schermerhorn Oil Corporation, 46 B.T.A. 151, 158; Steinbeck v. Gerosa, 4 N.Y.2d 302, 317, 175 N.Y.S. 2d 1, 13. It is not “enough that two parties have agreed to act in concert to achieve some stated economic objective.” Mitler v. Friedeberg, 222 N.Y.S. 2d 480, 485. And an agreement to share in the gross receipts of a specific venture merely as a basis of compensation may be a contract of employment rather than a joint venture. Sloane v. United Feature Syndicate, Inc., 238 N.Y.S. 91, 94; La Driere v. Martin, 56 N.Y.S. 2d 436, 437. Cf. United States v. Johansson, an unreported case (S.D. Fla. 1961, 8 A.F.T.R. 2d 6001, 6005-6006, 6007, 62-1 U.S.T.C. par. 9130), affirmed 336 F. 2d 809 (C.A. 5). The venture with which we are here concerned involved the promotion of a middleweight championship bout between petitioner and Basilio. The promoter of that venture was IBC. It entered into separate contracts with petitioner and Basilio under the terms of which each fighter became entitled for Ms services to a specified portion of the gross receipts from ticket sales, radio broadcasting, theater-television, and the sale of motion-picture rights. There is no evidence of any agreement of any kind entered into between petitioner and Basilio. Nothing was said in the contracts entered into by IBC with petitioner and Basilio about any joint venture, the sharing of any profits that might be realized or losses that might be sustained, or participation by petitioner and Basilio in the control or management' of the venture. Contrary to the Government’s contention, the portions of the contract giving Robinson access to the books of IBC and those requiring his consent in connection with the sale of the ancillary rights hardly provide for participation in management in the light of all the circumstances involved. These provisions were clearly intended merely for his own protection, to assure him that he would receive the maximum compensation for his services. The contracts before us provided for personal services by petitioner; they did not, and never were intended to, create a joint venture between IBC and petitioner. Cases cited by respondent in which various elements in combination were held to constitute a joint venture on the particular facts involved, not present here, are distinguishable. (b) Constructive Receipt. — The Commissioner makes the alternative contention that petitioner constructively received his full share of the proceeds of the Robinson-Basilio fight in 1957, and not in 1957, 1958, 1959, and 1960. He urges that the deferred-payment contract was a sham; that it was not, before and after its execution, intended by the parties thereto to be binding as to the manner in which petitioner was to be paid; that IBC was willing at any time after the fight in 1957 to make payment in full; and that petitioner’s receipt of his share of the proceeds of the fight in 1957 was not, therefore, subject to substantial limitations or restrictions so as to prevent its inclusion in petitioner’s 1957 income under the doctrine of constructive receipt. It is important to note that the Government does not base its constructive-receipt argument upon the fact that IBC was willing to enter into a contract on July 31, 1957, to make payment in full to petitioner immediately after the September 23, 1957, fight. Indeed the Government refers to example (3) in Rev. Rui. 60-31, 1960-1 C.B. 174, implying that a bona fide contract providing for deferred payments would be given effect notwithstanding that the obligor might have been willing to contract to make such payments at an earlier time. And that revenue ruling called attention (p. 180) to the withdrawal of the Commissioner’s nonacquiescence in James F. Oates, 18 T.C. 570, affirmed 207 F. 2d 711 (C.A. 7), followed by the substitution of an acquiescence. 1960-1 C.B. 5. Cf. Howard, Veit, 8 T.C. 809; Kay Kimbell, 41 B.T.A. 940; J. D. Amend, 13 T.C. 178; James Gould Cozzens, 19 T.C. 663. The essence of the Government’s argument here is that the contract was a sham and that the parties never intended to be governed by it. We do not agree. To be sure, there are a number of misleading statements in the “Whereas” clauses, falsely suggesting that the provisions for deferred payment were included for the benefit and at the request of IBC. But tiróse whereas clauses were plainly intended as window dressing merely to support an answer to the Government’s possible position that constructive receipt might be predicated upon IBC’s original pre-July 31 willingness to contract to make payment in full immediately after the fight. We are fully satisfied that once the contract was executed, it was looked upon by both parties as defining their legal rights, and that there was never any collateral understanding, tacit or otherwise, that the parties would not be bound by its terms. The Government relies upon certain testimony of IBC’s president that IBC would have paid petitioner immediately after the fight if he had insisted on it. We heard that testimony and are convinced that the witness meant merely that IBC would have been willing to contract to make immediate payment, not that it would have ignored its stated rights once a different contract had been executed. We find that the contract was not a sham, and that the inclusion of petitioner’s full share of the proceeds of the fight in his 1957 income may not be predicated upon the ground that the contract did not in fact represent a binding arrangement between petitioner and IBC. (c) Constructive Receipt — Further Alternatives. — The Government contends that even if it is wrong as to the sham character of the July 31, 1957, agreement, petitioner became entitled in 1957 under that very agreement to more than the $139,600 reported and is chargeable under the doctrine of constructive receipt with at least the amount payable to him in 1957 under the agreement.[2] We hold otherwise. Petitioner in fact received or there was paid out in his behalf a maximum of $139,600 in 1957. Although he was entitled to more in 1957 under the contract, that was all that he got at that time. And he cannot be charged, even under the doctrine of constructive receipt, with having received anything more in 1957. The proceeds of the fight were not placed in escrow or trust, or set aside in any special fund, or segregated in any way by IBO for petitioner’s benefit. They were commingled with all of IBC’s other assets, and petitioner was but an unsecured creditor of IBC. Had IBC meanwhile been declared bankrupt, petitioner’s claim against its assets would have rested on no firmer ground than those of other creditors similarly situated. To be sure, IBC probably would have been willing to pay over to petitioner the full amount due him in 1957, but the fact is that as a result of the notice of levy, it withheld payment beyond the amount permitted by the Commissioner. In the circumstances, there are not here present the conditions justifying the application of the doctrine of constructive receipt. To be sharply distinguished are such cases as those where payment had in fact been made to the taxpayer, cf. Kerr v. Bowers, 66 F. 2d 419 (C.A. 2), certiorari denied 291 U.S. 663, or those in which a special fund had been set aside for his benefit, cf. Dwight A. Ward, 20 T.C. 332, affirmed 224 F. 2d 547 (C.A. 9). 2. $10,000 Gash Payment. — We have found as a fact upon the evidence that IBC paid $10,000 in cash to petitioner or in his behalf to open his training camp. This amount represents additional income to petitioner, and should have been reported by him. 3. Miscellaneous Deductions, (a) Fight Tickets. — Petitioner purchased 190 tickets for the Basilio fight at $40 each, or a total of $7,600, which he distributed among various persons. The Commissioner disapproved a deduction in that amount. We think that some of those tickets, suck as those distributed to sparring partners or training camp employees, may fairly be classified as reasonably connected with petitioner’s trade or business as a professional boxer. On the other hand, it seems clear to us that to the extent that tickets were given to members of his family or personal friends, the expenditure therefore was personal and not deductible. It is not possible on the meager evidence before us to make any scientifically accurate determination as to what portion of the total represents a deductible business expense. Accordingly, relying upon Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2), we have found that $2,000 of the amount involved constitutes an ordinary and necessary business expense. (b) Payment of $7,331.91 to Ernie Bracea. — The Commissioner disallowed a deduction in the amount of $7,331.91 paid to one of petitioner’s managers, Ernie Bracea. The fact that such payment was made was not disputed. However, the record is utterly devoid of any evidence showing the nature of this payment. If the payment were for Bracca’s services as a manager it would obviously be deductible; on the other hand, it could have been for any one of a variety of purposes unrelated to petitioner’s trade or business that would have rendered it nondeductible. The burden of proof was upon petitioner, and it has not been carried. The Commissioner must be sustained as to this item. (c) Long Pond Inn Expenses. — Petitioner contends that he expended $2,000 for use of facilities at Long Pond Inn for training purposes in connection with the Basilio fight. Although the evidence is thin we have found that he spent $250 a week for 8 weeks for this purpose. Accordingly, the Commissioner’s disallowance of a deduction in the total amount of $2,000 in this respect must be disapproved. (d) Theft Loss. — Petitioner claimed a theft loss in the amount of $4,300. The Commissioner disallowed $2,000 thereof for lack of substantiation. The burden was upon petitioner, and we cannot find on this record that the Commissioner erred. Although we are satisfied that there was an embezzlement we cannot say on the evidence before us that the. amount involved was any greater than that allowed by the Commissioner. 4. Estimated Tax Penalty. — Petitioners did not make any payment of estimated tax for the year 1957. The joint return filed by them for the year 1957 showed a tax due in the amount of $37,416.85 which was paid on April 21, 1958, when the return was filed. In these circumstances, respondent’s determination that they were liable for an addition to tax in the amount of $1,043.56 under section 6654 of the 1954 Code for underpayment of their estimated tax for 1957 must be, and is, sustained. Estate of Barney Ruben, 33 T.C. 1071. Decision will be entered under Rule 50. The Commissioner also added $190 in respect of “camp admissions,” but this latter item has been conceded by petitioner on brief. The Government makes alternative contentions as to the amount payable in 1957 under the contract, (i) Since petitioner -was entitled under the contract to receive 40 percent of the proceeds of the fight in 1957, the amount payable in 1957 was therefore at least 40 percent of $483,666.71 ($193,466.68), plus 40 percent of the $32,516.74 ($13,006.70), or a total of $206,473.38. (ii) Alternatively, the Government argues that under the contract, as supplemented by the subsequent $255,000 guarantee in respect of closed-circuit theater television, petitioner became entitled in 1957 to receive $255,000 plus his contractual 40 percent of the remainder of the fight proceeds. We think that this latter alternative is incorrect in any event, because the $255,000 guarantee did not modify the July 31, 1957, contract as to the time of payment, and under that contract petitioner became entitled to only 40 percent of the proceeds in 1957. However, it is a matter of no moment here as to which computation is accepted, in view of our holding that petitioner is not chargeable with more than $139,600 for 1957 in respect of his compensation for participating in the Basilio fight.