BILLY E. ARNWINE AND SHIRLEY S. ARNWINE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9348–76.    Filed April 2, 1981.

*William Norton Baker* and *Karl Norman Clifford*, for the petitioners.

*Thomas G. Potts* and *Kenneth A. Little*, for the respondent.

GOFFE, *Judge*: The Commissioner determined a deficiency in petitioners' Federal income tax for their taxable year 1973 in the amount of $11,656.65. After concessions by petitioners, we need only determine the appropriate taxable year in which amounts obtained by petitioners from the sale of cotton should be included in their gross income.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Billy E. Arnwine (herein petitioner) and his wife, Shirley E. Arnwine, filed a joint Federal income tax return for their taxable year 1973, during which they maintained their books and records and reported their income and expenses based upon the cash receipts and disbursements method of accounting. When they filed their petition herein, petitioners resided near Levelland, Tex.

During 1973 petitioners were primarily involved in the business of cotton farming in the Levelland, Tex., area. Petitioners rented from Joe Mears the land on which the cotton in

question was grown, and they paid, as rental for such use, every fourth bale of cotton produced from the rented land.

During 1973, Owens Independent Gin, Inc. (herein the Gin), an independent cotton gin, was owned and operated by Fred Owens (herein Owens). Petitioner was not a director or employee of the Gin in 1973.

W. A. Wadlington (herein Wadlington) was a cotton buyer in the Levelland area representing several large cotton purchasers. He was designated as an agent for such purposes by these purchasers and was paid on a commission basis for cotton that he purchased on their behalf. In 1973, he represented two cotton purchasers, Dan River Cotton Co., Inc. (herein Dan River), and C. Itoh & Co. (America), Inc. (herein C. Itoh).

Early in 1973, Wadlington contacted Owens and informed him that his principals were willing to purchase a specified number of acres of cotton to be grown and harvested in 1973. Wadlington outlined the price his principals would be willing to pay for cotton of varying grades and staples. Wadlington approached Owens with this information because he knew that Owens might be helpful in finding cotton growers who would be willing to contract for the sale to Wadlington's principals of the cotton grown on their acreage during 1973. Utilizing a cotton ginner in this manner was the usual practice in the area. Because the ginner foresaw an opportunity to clinch some ginning business, he would help cotton buyers locate potential cotton sellers.

Owens contacted petitioner to see if he would sell some of his yet-to-be-planted 1973 cotton crop under the terms given to Owens by Wadlington. After considering this opportunity for a day or two, petitioner informed Owens that he would be willing to make such sales.

As a result of these discussions, the following contract was executed on March 5, 1973:

| | |
|---|---|
| *Seller* —Owen Gin Co. | *Buyer* —Dan River Cotton Co., Inc. |
| P.O. Box V | 49 Union Avenue |
| Levelland, Texas 79336 | Memphis, Tennessee 38103 |

Grower —Bill Arnwine

The Dan River Cotton Co., Inc. does herewith confirm the purchase of the entire production on 250 acres of Dunn 118 and/or 119 variety cotton. Cotton shall be of the coming crop year (season of 1973–74) and will be stored on the Levelland Compress, Levelland, Texas.

The cotton to be ginned at the Owen Gin Co., Levelland, Texas. If the gin is

destroyed by fire or any other reason a mutually acceptable gin will be designated.

It is mutually understood and agreed that the prices that are herein made are based on F.O.B. car terms, Levelland, Texas. Original compress NET weights are to apply. T.C.A. rules to apply for Light or Heavy Weights. Following prices are for 3.5 thru 4.9 micronaire.

| Grade and Staple | Price | Grade and Staple | Price |
|---|---|---|---|
| (3134) Middling | 30.00 | (3234) MLtSp | 29.00 |
| (4034) SLM Plus | 29.00 | (4234) SLMLtSp | 28.00 |
| (4134) SLM | 29.00 | (5234) LMLtSp | 26.00 |
| (5034) LM Plus | 28.00 | (3334) MSp | 26.00 |
| (5134) LM | 28.00 | (4334) SLMSp | 24.00 |
| (6034) SGO Plus | 25.00 | (5334) LMSp | 23.00 |
| (6134) SGO | 25.00 | (3434) MTg | 23.00 |
| (5134) GO | 23.00 | (4434) SLMTg | 21.00 |
| (2234) SMLtSp | 29.00 | (5434) LMTg | 18.00 |

The above prices are based for $1\frac{1}{16}$ inch and longer staple. Cotton is to be delivered down through inch staple at government loan differences. Government loan differences are to apply for other micronaire groups but nothing lower than 3.0 micronaire can be applied. Government loan differences for Barks or Grass are to be applied. No Rood harvested cotton is to apply. It is agreed that the Growers will not irrigate beyond the date of August 20, 1973.

It is understood that the foregoing prices are for cotton harvested before January 1, 1974. Harvested is to mean actually removed from the stalks in the Grower's field. The cotton may be stored in seed cotton form awaiting ginning and be applied on this contract. For such cotton that has not been harvested the following penalties are to be applied. For cotton harvested Jan. 1 thru Jan. 15, 100 points; Jan. 16 thru Jan. 31, 200 points and cotton harvested after Jan. 31, 1974, 300 points. The seller is to keep records of harvesting dates on all fields and will supply the buyer information as to the Grower's compliance to this feature of this contract.

The seller is to make available to the buyer copies of contracts of the participating Growers which is [sic] to list their individual acres and the farm serial numbers. The buyer shall be afforded the opportunity, at his request, to examine any and all records as pertains [sic] to his interest concerning this acreage. It is understood that permission is given by the Grower for the buyer to have access to ASCS records.

The cotton will be invoiced to Dan River Cotton Co., Inc. by the Gin as soon as it is ginned and placed on the compress. The drafts are to contain green card invoices and warehouse receipts. A copy of the invoices to W. A. Wadlington. The Cotton Board assessment shall be paid by the Gin.

| For the Seller | For the Buyer |
|---|---|
| (S) Fred G. Owens | (S) W. A. Wadlington |
| OWEN GIN CO. | W. A. WADLINGTON FOR |
| | DAN RIVER COTTON CO., INC. |

(S)  Billy  Arnwine                         Farm  Serial  No.  *D-8012 — 60  Acres*
       *Participating  Grower*                                    *D-  590 — 60  Acres*
                                                                 *D-2008 — 40  Acres*
(S)  Joe  Mears          D-8012                 ·              *D-  603 — 40  Acres*
       *Landlord*                                               *D-  550 — 50  Acres*

(S)  C.  N.  Arnwine      D-2008
       *Landlord*

                                              March  5,  1973
                                              *Date*

On March 13, 1973, another contract was executed. The only
significant differences between this contract and the March 5,
1973, contract are: (1) The "Buyer" is C. Itoh; (2) the acreage
covered by the document is different; (3) 360, as opposed to 250,
acres are covered by the document; (4) Wadlington signed the
document "for C. Itoh & Co., (America) Inc." instead of "for Dan
River Cotton Co., Inc."; (5) no landlord signed the contract; and
(6) the execution date is March 13, 1973. These two contracts will
sometimes be referred to herein as "the forward contracts." The
forward contracts were drafted by Wadlington. The Gin was
made a party to the forward contracts because Wadlington had,
in the past, been confronted with situations where the ginner
had helped cotton growers try to evade their obligations under
such contracts. Thus, he drafted the contracts in order to bind
the ginner to the contract. The Gin was not the seller of the
cotton contracted for under these forward contracts.

Petitioner planted cotton on the acreage covered by the
forward contracts, as well as on other acreage. While the cotton
was growing, Wadlington expected Owens to give him regular
status reports on the progress of the cotton crop, which Owens
did. Owens also kept track of which farmers were developing
what acres and how that might affect the cotton covered under
various forward contracts (including the two mentioned above)
which Wadlington had arranged for Dan River and C. Itoh.

Upon harvesting his cotton, a cotton grower takes it to a
cotton gin where he pays to have the cotton ginned. The ginned
cotton is then sent to a compress where it is compressed into
bales and stored, the owner of the cotton receiving warehouse
receipts for the cotton. A warehouse receipt is a negotiable
bearer instrument which evidences title to the cotton stored in a
warehouse. Samples from each bale are sent to the Government
classing office where the cotton is classified according to grade

and staple. The classing office then issues classing cards (green cards) to the owner of the cotton. The green cards indicate the grade of the cotton represented by each warehouse receipt.

In October and November of 1973, petitioner harvested the cotton from the acreage covered by the forward contracts and paid to have the cotton ginned at the Gin. Following the ginning of the cotton, the Gin delivered the cotton to a warehouse and obtained the attendant warehouse receipts and green cards. The Gin maintains a separate box or drawer for each grower for whom it gins cotton and places the grower's warehouse receipts and green cards in the appropriate box or drawer when they are received. It is common practice for growers to leave their warehouse receipts and green cards in their respective boxes at the Gin until their cotton is sold. The warehouse receipts and green cards for petitioner's cotton covered by the forward contracts, along with the warehouse receipts and green cards for petitioner's other cotton (herein sometimes referred to in the aggregate as the cotton, were placed in petitioner's box at the Gin. Petitioner had unrestricted access to his box at the Gin. Petitioner's warehouse receipts and green cards for the cotton that had been ginned up to that time were not in petitioner's box immediately prior to November 20, 1973.

On November 20, 1973, petitioner and Owens, on behalf of the Gin, executed the following document (herein the deferred payment contract):

### DEFERRED PAYMENT CONTRACT.

This contract is entered into this 20th day of November, 1973, between Billy E. Arnwine, hereinafter called Seller, and Owens Independent Gin, Inc., hereinafter called Buyer, covering the sale of 101,655 lbs. of Cotton listed on attached invoice. The Seller agrees to sell and the Buyer to buy said Cotton at the agreed market price on date of delivery under the following terms and conditions:

A. Upon delivery of the Cotton to the Buyer under this Deferred Contract, title thereto shall pass to the Buyer. The market price subsequently to be paid to the Seller shall be fixed at the date the Cotton is delivered to the buyer.

B. Regardless of the time when Cotton is delivered under this Deferred Payment Contract is sold by the Buyer, it is agreed by the parties hereto that NO PAYMENT OF ANY KIND will be made by the Buyer on account thereof prior to January 1, 1974.

C. Within five days after the date specified in paragraph B above the Buyer will pay to the Seller the full market price determined under paragraph A minus the customary charges.

Signed this the 20th day of November, 1973.

(S) Owens Ind. Gin Inc.                                    (S) Billy Arnwine
    *Buyer*                                                        *Seller*

(S) Fred G. Owens, *Pres.*

This contract provided for no collateral or other security for payment of the purchase price. After signing this deferred payment contract, petitioner turned over to the Gin, for delivery to various cotton buyers, the warehouse receipts and green cards for the cotton that had been ginned up to that time.

The cotton described in the deferred payment contract included that cotton which was sold under the forward contracts as well as cotton that was purchased by two other buyers, the California Cotton Sales Co. (herein California Cotton) and Producers Marketing Association (herein Producers). Both petitioner and Owens believed that the Gin was executing the deferred payment contract on behalf of and as agent for the four purchasers of the cotton sold under such contract.

Petitioner entered into the deferred payment contract in order to defer until 1974 the receipt of income from the sale of part of his 1973 cotton crop. Most of the receipts from the sale of his 1972 cotton crop had been received in 1973 because of a late harvest; therefore, petitioner's attempt to delay the realization of his income from the sale of his 1973 crop was motivated by a desire to avoid reporting the income from two crops in a single taxable year.

When petitioner delivered the cotton to the Gin, Owens, on behalf of the Gin, prepared invoices that showed: (1) Which bales were now in the Gin's possession (i.e., which bales were represented by the warehouse receipts and green cards now in the Gin's possession); (2) the seller of the cotton being invoiced (here petitioner); (3) the buyer of the cotton being invoiced; (4) the gross sales price of the cotton being invoiced (number of bales times the applicable price per bale); (5) deductions from the sales proceeds for storage and for assessments of the Cotton Producers Institute; and (6) the net amount attributable to the cotton being invoiced which was payable to the seller/grower. Copies of these invoices were mailed to the seller and to the buyers (or, in the case of Dan River and C. Itoh, to their agent, Wadlington).

The following table shows when the cotton involved here was

invoiced to the four cotton purchasers to whom petitioner sold cotton under the deferred payment contract:

| Date of invoice | Buyer | Number of bales |
|---|---|---|
| 11/21/73 | Cal. Cotton | 8 |
| 11/22/73 | Cal. Cotton | 20 |
| | Dan River | 12 |
| | C. Itoh | 9 |
| | C. Itoh | 7 |
| | C. Itoh | 9 |
| | C. Itoh | 18 |
| 11/28/73 | C. Itoh | 8 |
| 12/ 5/73 | C. Itoh | 40 |
| | C. Itoh | 14 |
| 12/ 9/73 | Producers | 13 |
| | Producers | 5 |
| 12/13/73 | C. Itoh | 36 |
| 12/14/73 | Producers | 12 |

By general custom, the Gin would handle the transfer of the cotton to the purchasers. It also received from such purchasers the proceeds from the sale of such cotton, with the implicit understanding that it would forward the appropriate amounts to the various seller/growers. This latter duty was usually accomplished by using bank drafts. The Gin would prepare a draft on the bank of a purchaser in an amount equal to the *sum of* the amount shown on the invoices as the net amount due to the seller/growers *and* the Gin fees (defined below). In order to have the bank draft honored, the Gin sent the draft, warehouse receipts, green cards, and applicable invoice(s) to the purchasers (or, in the case of Dan River and C. Itoh, to their agent, Wadlington) for approval. The proceeds of these drafts were held in the Gin's Bill of Exchange Account (herein BX Account) at the Levelland State Bank, which account was an account separate from the Gin's general operating account and was used exclusively to handle this kind of cotton transaction.

The Gin received payment from the four purchasers in its BX Account within 10 days of the submission of each draft, and all payments due petitioner were received in such account prior to December 31, 1973.

In January of 1974, petitioner received from the Gin the amount due him from the sale of the cotton ($35,801.92), such amount being paid from the Gin's BX Account.

As compensation for the services performed by the Gin for the purchasers, i.e., monitoring and reporting on the progress of the crop, taking delivery of the cotton, invoicing the cotton, and accomplishing the transfer of funds from the purchasers to the appropriate growers, the four cotton purchasers paid the Gin $0.75 per bale (herein the Gin fees).

On their 1973 Federal income tax return, petitioners did not include in their gross income the above amount received from the Gin in January of 1974, nor did they include such amount on an amended return for 1973 which they filed in 1978. The Commissioner determined in his statutory notice of deficiency that such amount should be included in petitioners' gross income for their taxable year 1973.

## OPINION

In March of 1973, petitioner contracted with Dan River and C. Itoh to sell them the cotton to be grown on certain acreage farmed by him. The Gin was nominally named as a seller under such contracts. While the cotton was growing, the Gin, which assisted the purchasers in finding cotton for sale, informed the purchasers as to the status of the cotton crop.

In October and November of 1973, petitioner harvested his cotton and had it ginned at the Gin. Prior to delivery of title to the cotton purchaser, petitioner, as seller, and the Gin, as "buyer," signed a deferred payment contract whereby it was agreed that petitioner would not receive payment prior to January 1, 1974, for the cotton to be delivered (which included the cotton covered under the March forward contracts and cotton to be sold to two other purchasers—California Cotton and Producers). This agreement was entered into by petitioner and the Gin to defer until 1974, for tax purposes, the receipt of the income from the sale of the cotton covered by such contract.

In November and December of 1973, petitioner delivered the specified cotton to the Gin, which invoiced it to the various buyers. The Gin prepared drafts on the banks of the buyers and sent such drafts, along with the appropriate documents of title for the invoiced cotton, to the buyers for their approval. The amounts of such drafts included a fee equal to $0.75 per bale which the buyer paid to the Gin for various services it performed for such purchasers. The proceeds from such drafts, when

honored, were deposited in the Gin's bank account. All such payments were made prior to December 31, 1973.

In January of 1974, the Gin paid petitioner the amount owed him. Petitioners did not include such amounts in their gross income for their taxable year 1973. The Commissioner determined that such proceeds should have been included in their gross income for their taxable year 1973.

Section 451, I.R.C. 1954,[1] prescribes the general rule that "any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer" unless, under the taxpayer's method of accounting, such amount is "properly accounted for as of a different period." Section 1.451–1(a), Income Tax Regs., provides that taxpayers, such as petitioners, who use the cash receipts and disbursements method of accounting, shall include in gross income amounts "when actually or constructively received." Section 1.451–2(a), Income Tax Regs., explains the constructive receipt concept as follows:

Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.

Respondent maintains that, under this regulation, petitioner constructively received the cotton crop proceeds in question in 1973. He argues that petitioner's deferred payment agreement was not a bona fide, arm's-length agreement and, thus, did not shield petitioner from the receipt of such income in 1973. Further, respondent contends that the Gin was petitioner's agent in the sale of the cotton, and that the Gin's receipt of the sale proceeds was, for tax purposes, the equivalent of petitioner's receipt thereof. Petitioners, on the other hand, contend that the deferred payment contract was a bona fide, arm's-length agreement and was carried out by all the parties. They deny that the Gin was petitioner's agent for the receipt of the proceeds from the sale of his cotton, contending, instead, that the Gin was the agent of the purchasers.

---

[1] All section references are to the Internal Revenue Code of 1954 as amended.

First, we will examine the deferred payment contract and determine whether it was a bona fide, arm's-length agreement. Respondent's major attack on this point focuses on the designation in the contract of the Gin as "Buyer." He argues that, because the Gin clearly was not the buyer of the cotton, the contract failed a condition precedent, i.e., that the Gin buy the cotton, and, therefore, that the Gin was not under a binding obligation to withhold the proceeds which are the subject of this controversy. We do not find this argument persuasive.

In the first place, it is clear that the Gin, at least during this part of the transaction, was acting on behalf of the buyers of the cotton. This relationship will be examined more fully in the discussion of the agency theory, *infra*. Moreover, for respondent's argument on the bona fides of the contract to have any merit, there must be evidence that the deferred payment contract was a sham and that the parties never intended to be bound by it. *Schniers v. Commissioner*, 69 T.C. 511, 518 (1977). The evidence points to the contrary. The evidence establishes that all of the parties, petitioner, the Gin, and the purchasers, considered the deferred payment contract binding and that they abided strictly by its terms. We are convinced that the deferred payment contract herein was a bona fide, arm's-length agreement, that once it was executed it was looked upon by all of the interested parties as defining their legal rights, and that there was never any collateral understanding, tacit or otherwise, that the parties would not fully perform its terms. See *Robinson v. Commissioner*, 44 T.C. 20, 36 (1965).

Having decided that the deferred payment contract was bona fide and binding, respondent's constructive receipt argument must fail. The facts herein are virtually indistinguishable from those in *Schniers v. Commissioner, supra,* wherein we stated:

> The point is that income is not realized by a cash basis farmer from merely harvesting his crops. He realizes income only when he actually or constructively receives income from the sale of those crops. He is not required to sell the crops in the year in which he harvests them. He may decide not to sell them until the following year. Nor is he required, if he decides to sell them in the year of harvest, to contract for immediate payment for his crops. The contract may call for payment after the close of the harvest year and he does not realize income in the year of sale if the contract is a valid, enforceable one. He may decline to accept sale terms which call for payment in the year of sale in the same manner, for example, as a real estate owner may insist on limiting the year-of-sale payment to 30 percent of the selling price so that he may report his

gain under the section 453 installment method. Or he may time the sale in the same manner as a shareholder may time the sale of his stock to offset his gains against his losses in the taxable year. [69 T.C. at 517.]

Thus, under the recent controlling precedent of *Schniers*, we hold that petitioner did not constructively receive in 1973 the proceeds from the sale of this cotton.

Respondent's other contention, that the Gin was petitioner's agent, requires a more extensive treatment. The significance of a finding that the Gin was petitioner's agent *for all purposes* would be that, because receipt by an agent is receipt by the principal (*Williams v. United States*, 219 F.2d 523 (5th Cir. 1955)), and because the Gin received the proceeds in question during 1973, the proceeds would be deemed received by petitioner in 1973 and, therefore, includable in petitioners' income in that year. This agency theory should be distinguished from the constructive receipt doctrine discussed above, in that, under the constructive receipt doctrine, the issue is whether proceeds not actually possessed by a taxpayer are nonetheless available to him in such a manner that his control over them is not subject to any substantial limitations or restrictions, whereas under the agency theory, the issue is whether proceeds were deemed possessed by a taxpayer by reason of possession of the proceeds by his agent. If a taxpayer's agent for the receipt of such proceeds receives them, then any agreement between them which purports to place the proceeds beyond the taxpayer's reach is a nullity. Since the Gin's actual receipt of the proceeds from the sale of the cotton in 1973 is established, the only issue we must decide in this context is whether, for purposes of receiving payment for the cotton, the Gin was petitioner's agent.

The facts proved in *Schniers v. Commissioner, supra,* as well as the general business practice, convinced us at that time that the gin was not the agent of the seller of the cotton, but instead the agent of the purchaser. Specifically, in *Schniers* we found that the gin was the agent of the purchaser in executing the deferred payment contract and in "handling the transactions." *Schniers v. Commissioner, supra* at 519. In concluding our disposition of respondent's agency argument, we said, "In no sense, therefore, can it be held that the gin acted as petitioner's agent *in receiving* in December 1973 *payment* for the cotton he sold to Traylor." *Schniers v. Commissioner, supra* at 519 (emphasis added).

The evidence before us in this case is no different. It is obvious that the Gin's activities are comprehensible only when viewed as actions of an agent for the purchasers. The purchasers contacted the Gin which contacted petitioner. Petitioner did not go to the Gin seeking purchasers for his cotton crop. When the Gin advised Wadlington of the progress of the cotton crop, it was acting as an agent of the purchasers. When Owens signed the deferred payment contract on behalf of the Gin as "Buyer," everyone involved must have understood that he was doing so as a representative of the purchasers because all parties carried out the terms of the deferred payment contract. When the Gin accepted delivery of petitioner's cotton, when it performed the ministerial tasks of moving the proceeds from the sale of such cotton from the purchasers to petitioner, and when it was compensated for these services by the purchasers, it is manifest that, especially for purposes of *making payment*, the Gin was the agent of the purchasers. Here, as in *Schniers*, the Gin was not, especially for purposes of *receiving payment*, the agent of petitioner. Petitioner compensated the Gin only for ginning his cotton. He paid it nothing by way of a commission for finding purchasers for his cotton.

Were it not for a decision of the U.S. Court of Appeals for the Fifth Circuit (the court to which this decision is appealable) which has been rendered since our decision in *Schniers*, no further discussion would be necessary. However, under the rule of *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we follow a holding of a Court of Appeals to which a decision of this Court is appealable when it appears that an existing holding of that court squarely controls the issue before us. This rule suggests that we must analyze the recent decision of the Fifth Circuit, *Warren v. United States*, 613 F.2d 591 (5th Cir. 1980), and determine its effect on our decision.

In *Warren*, the cotton grower sought the services of the gins not only to gin, bale, and prepare the cotton for sale, but also to find buyers for his cotton. Because of this latter function, the Government argued that the gins were acting as agents of the growers/sellers. The gins held the ginned cotton, constantly relayed price information to the sellers, and immediately consummated the sales upon the instructions of the sellers. The sellers would also instruct the gins to "defer" the proceeds

obtained from the sale. The gins' role in the sale of the cotton was to adhere to the instructions of the sellers.

The case was tried before a jury in August 1977. The Government moved for a directed verdict during trial which was denied. The jury was instructed with four special interrogatories and returned a verdict for the taxpayers. After judgment was entered, the United States filed a motion for judgment notwithstanding the verdict or for a new trial, which was denied.

On appeal, the Court of Appeals held that the relationship between the gins and the taxpayers for selling the cotton was that of principal and agent. Concluding that the District Court erred in not granting the Government's motions for directed verdict or for judgment n.o.v., the Court of Appeals reversed.

The facts before us are distinguishable from those of *Warren*. The Gin in the instant case performed many more services for the purchasers than did the gins in *Warren*. The purchasers involved here approached the Gin, whereas in *Warren* the sellers sought the services of the gins to find purchasers for the cotton.

In addition, even if we did not find as a fact that the Gin acted fully as the agent for the purchasers, we conclude that under the law of agency, the Gin acted for them, and not petitioner, in the most critical part of the transaction for section 451 purposes, i.e., when payment for the cotton was made.

We look to the law of Texas to examine the legal relationship among petitioner, the Gin, and the purchasers. The Texas courts have shown a predisposition to rely on the Restatement of Agency (Second) when ruling on questions of agency law. *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250 (5th Cir. 1980); *Valley View Cattle Co. v. Iowa Beef Processors, Inc.*, 548 F.2d 1219 (5th Cir. 1977), cert. denied 434 U.S. 855 (1977); *Rufenacht v. Iowa Beef Processors, Inc.*, 492 F. Supp. 877 (N.D. Tex. 1980); *American Employers Insurance Co. v. Kilgore*, 412 S.W.2d 67 (Tex. Civ. App. 1967).

Section 14 L of the Restatement (Second) of Agency (1957) provides:

Sec. 14 L. Ambiguous Principal

(1) A person who conducts a transaction between two others may be an agent of both of them in the transaction, or the agent of one of them only, although the agent of the other for other transactions, or the agent of one for part of the transaction and the agent of the other for the remainder.

(2) Unless otherwise agreed, one who has received money or other property

from another to be paid or transferred to a creditor of the other is the agent of the other and not of the creditor.

A pertinent part of the Comment to this section gives this explanation:

b. A person may be an agent for one principal for part of a transaction and an agent for the other for the remainder. * * *

The above-stated principle has been applied in *Thayer v. Pacific Electric Railway Co.*, 55 Cal. 2d 430, 11 Cal. Rptr. 560, 360 P.2d 56 (1961), cert. denied 368 U.S. 826 (1961). We are convinced that this principle is applicable here.

If we were to hold that the Gin acted as agent for petitioner in securing purchasers for his cotton, as the Court of Appeals held under a distinguishable set of facts in *Warren v. United States, supra,* we, nevertheless, would apply the above-quoted rationale of the Restatement and fragment this transaction in order to determine whether the Gin was petitioner's agent *for purposes of receiving payment,* which is the relevant activity for purposes of our inquiry under section 451. Based upon the record before us, we conclude that in the portion of the total transaction when payment for the cotton was made, the Gin was not petitioner's agent, but, instead, was the agent of the purchasers of the cotton.

As we pointed out above, the purchasers did not execute the deferred payment contract, yet when petitioner delivered the cotton to the Gin, the Gin paid for the cotton in a manner consistent with the terms of the deferred payment agreement, using funds transferred to it from such purchasers. The undisputed testimony at trial was that the fees paid by the purchasers to the Gin were for various services, including "invoicing" the cotton. In the channels of commerce, the invoice is an essential step in payment for goods. This is strong evidence that the Gin acted for the purchasers in paying petitioner for his cotton.

Although the taxpayer in *Warren* relied upon our holding in *Schniers,* the Court of Appeals did not cite *Schniers* in its opinion. Because of our holding that the facts in *Warren* are distinguishable from the facts here, we conclude that the rationale of *Warren* does not, as a matter of law, preclude our finding of fact that the Gin was the agent of the purchasers, especially as to the most critical aspect of the transaction, the payment for the cotton.

Accordingly, we hold that petitioner did not receive the proceeds from the sale of his cotton in 1973 through an agent and he did not constructively receive the proceeds in 1973. The proceeds are, therefore, not taxable to petitioners in 1973.

*Decision will be entered under Rule 155.*