KENNETH D. HERNDON AND TONYA HERNDON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Herndon v. Commissioner
Docket No. 4262-80.
United States Tax Court
T.C. Memo 1986-230; 1986 Tax Ct. Memo LEXIS 372; 51 T.C.M. (CCH) 1144; T.C.M. (RIA) 86230; June 9, 1986. J. R. Blumrosen, for the petitioners. A. Shawn Noonan, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: The Commissioner determined deficiencies in petitioners' Federal income taxes for their taxable year 1973 in the amount of $8,322.71 and for their taxable year 1974 in the amount of $800.22. After concessions, the only remaining issue in this case is whether the proceeds from the sale of petitioners' cotton in the amount of $33,858.91 is income to petitioners in the calendar tax year 1973 or 1974. [1]
*373 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, oral supplemental stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Kenneth D. Herndon (petitioner) and his wife, Tonya Herndon, filed joint Federal income tax returns for the calendar years 1973 and 1974, during which time they maintained their books and records and reported their income and expenses based upon the cash receipts and disbursements method of accounting. Petitioners resided at Anson, Texas, during all periods involved in this case. During 1973, petitioner's primary occupation was farming, and cotton was petitioner's main crop. Although cotton is a major "cash crop" in West Texas, the farmers are at the mercy of the limited and erratic rainfall in that area. The time of planting cotton is dependent upon the timing and quantity of spring rain. If the spring rain is late in one year and early in the next year the result may be two harvests in the same taxable year. Further exacerbating this distortion in income is the lack of offset of expenses of farming attributable to the first year's crop which is harvested in the early portion *374 of the next taxable year. To counteract these factors, the cotton farmers of the West Texas area have attempted methods of deferring receipt of proceeds from a second harvest in a single year. Over the years there has been tax litigation concerning these phenomenons. This case is one in a relatively large succession of "deferral cases." On August 28 and 29, 1973, petitioner entered into written contracts with Hodge & Fields Cotton Co., Inc. (H&F), which provided that petitioner would grow and sell 158 bales of cotton, at specified prices. [2] These contracts were entered into prior to the time that the cotton was harvested. [3] After concessions, a $33,858.91 payment under these contracts is the amount in dispute. *375 H&F was primarily engaged in the cotton merchandising business and maintained its headquarters in Abilene, Texas. As a cotton merchant, H&F acted as an intermediary between cotton producers and large consumers of cotton by purchasing cotton from farmers and selling the cotton to shippers. Customarily, H&F would first agree to sell at a given price and then offer to buy a like amount of cotton from a producer at a slightly lower price. The difference in price was H&F's gross profit. All of the cotton covered by the forward contracts was ginned at the Farmers Cooperative Gin (the Gin). [4] The Gin's primary business in 1973 was to gin cotton, but the Gin also served as a middleman between farmers and cotton merchants. Petitioner was an officer and stockholder patron of the Gin. Raymond McLaren (McLaren) was manager for the Gin, and Dennis Brown (Brown) was the bookkeeper. McLaren had authority to make day-to-day business decisions on behalf of the Gin, and *376 regularly spoke with patrons; Brown wrote payroll checks, and handled some of the cotton sold through the Gin. One of Brown's duties as a bookkeeper was filling in both cotton purchase and sales contracts and deferred payment contracts. Brown had full authority to sign the deferred payment contracts on behalf of the Gin. Brown, however, only entered into cotton purchase and sales contracts after cotton merchants such as H&F authorized him to act on their behalf. Before entering into any cotton purchase and sales contracts, Brown contacted H&F to make sure H&F wanted to purchase cotton at the terms requested, unless Brown had talked to H&F earlier in the day. On October 29 and December 4, 1973, petitioner entered into deferred payment contracts with respect to portions of the cotton covered by the August contracts between H&F. [5] The deferred payment contracts used in this case were modified forms of some blank deferred payment contracts left at the Gin by H&F. McLaren deleted H&f's name from those contracts and substituted the Gin's name. [6]
*377 The deferred payment contracts purported to sell cotton to the Gin, but neither of the parties intended for the Gin to actually purchase any cotton. The decision to defer payment was solely petitioner's, as was the decision of how much of the proceeds to defer.The only time that petitioner talked directly with H&F about the possibility of deferring some sales proceeds of the August contracts was during the negotiations of such contracts. During November and December of 1973, petitioner delivered to the Gin the cotton covered by the deferred payment contracts. Petitioner received payment from the Gin in January 1974. [7] The Gin received the same commission price per bale of cotton whether or not the payment was deferred but, if payment was deferred, had the use of the proceeds during the interim period. Petitioner was not aware that H&F turned the monies over to the Gin until after H&F had done so. *378 Petitioner was not the only farmer who decided to defer payment in 1973. Many other members of the Gin also entered into such agreements. All deferred payment contracts were handled the same way. After the Commissioner audited one Gin member who had entered into such deferred payment contracts, Frank Lollar (Lollar), a meeting of the Gin membership was held. Among those present at the meeting were Lollar, petitioner, Stephen Johnson (Johnson), and Borden Duffel (Duffel). Johnson, an Internal Revenue Service agent, had conducted the Lollar audit. Duffel was Lollar's accountant, as well as accountant for H&F, the Gin, and some other Gin members. Discussion of selecting a test case for all Gin members using the deferred payment contracts ensued, and Duffel suggested using the Lollar case. Johnson apparently agreed. [8] The membership of the Gin approved the selection at the meeting. There was no further discussion of this decision, and the agreement was not reduced to writing. The Lollar case proceeded to trial *379 in the United States District Court for the Northern District of Texas. A jury verdict was returned in favor of Lollar. [9] The only question addressed by the jury was: "Do you find by a preponderance of the evidence that the Farmers Cooperative Gin of Anson was not acting as agent for the plaintiff Lollar in receiving and holding the proceeds in question from the sale of his cotton during the calendar years 1972 and 1973?" The jury answered: "It was not acting as agent for plaintiff Lollar in receiving and holding such proceeds." OPINION The issue we must decide is whether the proceeds from the sale of cotton are taxable income to petitioner in 1973 or 1974. Respondent argues that the Gin was petitioner's agent and that the proceeds are taxable in 1973, the year they were received from H&F. Alternatively, respondent argues that petitioner was in constructive receipt of the proceeds in 1973. Petitioner argues that the Gin was acting as H&F's agent and not as petitioner's agent in receiving the sales proceeds, and that he was not in constructive *380 receipt of the proceeds in 1973, since they were not available to him until 1974. [10]
A finding for respondent on either of his theories would render the proceeds taxable in 1973.We agree with respondent that the Gin was acting as petitioner's agent, and therefore that the proceeds were taxable in 1973. [11]
It is undisputed that the Gin received the proceeds *381 in 1973, and that if the Gin was acting as petitioner's agent, the general rule that receipt by an agent is receipt by the principal applies. See Williams v. United States,219 F.2d 523 (5th Cir. 1955). Under the law of agency in Texas, a person may be an agent for one principal for one part of a transaction, and an agent for another principal for the remainder. Arnwine v. Commissioner,696 F.2d 1102, 1108 (5th Cir. 1983), revg. 76 T.C. 532 (1981); 1 Restatement, Agency 2d, sec. 14L (1957). The critical aspect of this transaction is whether the Gin was acting solely on petitioner's behalf and at his direction with respect to the distribution of the sales proceeds. Arnwine v. Commissioner,supra at 1109. We find that the controlling facts here are indistinguishable from those in Arnwine and, accordingly, find for respondent.[12]
The Arnwine taxpayer, Mr. Arnwine, was *382 also a West Texas cotton farmer with loosely defined delivery and deferred payment contracts. Mr. Arnwine entered into forward contracts to sell cotton with Mr. Wadlington, a representative of various cotton buyers.The buyers, through Mr. Wadlington, contacted Mr. Owens (owner of an independent gin) requesting information about cotton for sale. Mr. Owens, in turn, approached Mr. Arnwine. An agreement was reached between the parties. [13]
Subsequently, Mr. Arnwine entered into a deferred payment contract (covering the same cotton) with Mr. Owens. The contract did not mention the buyers and was not approved by them; it did not *383 purport to alter any obligation to make payment for cotton upon delivery; and, it was made solely at Mr. Arnwine's direction and for his benefit. The Fifth Circuit held that an agency relationship existed between Mr. Arnwine and the gin, and further, stated that the case was indistinguishable from Warren v. United States,613 F.2d 591 (5th Cir. 1980): [14]
The Tax Court attempted to distinguish Warren on the grounds that the Gin here provided "many more" services for the purchasers than did the gins in Warren and that the "purchasers involved here approached the Gin, whereas in Warren the seller sought the services of the gins to find purchasers for the cotton." Even if those statements were accurate, the factors described do not serve to distinguish Warren.The critical economic relationship between the taxpayer and the Gin relating to the distribution of the sales proceeds is in all material respects identical to that which this court in Warren found to be indisputably that of principal and agent. The taxpayer maintained full control of the disposition of the proceeds of his cotton, and the basic function of the Gin was to follow his instructions *384 with respect to those proceeds. [Emphasis added. 696 F.2d at 1109-1110.] *385 The critical facts here are the same as in Arnwine: petitioner maintained full control over the proceeds until he chose to impose a self-limitation on the access; the Gin merely followed petitioner's instructions. The deferred payment contracts were executed by petitioner and the Gin, acting in its own name; the contracts were made solely at petitioner's direction and for his benefit. We therefore, on the basis of Arnwine, conclude that the relationship between petitioner and the Gin was one of principal and agent with respect to the distribution of the sales proceeds. [15]
To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Petitioners on brief and in their petition contest $38,551.04 of proceeds, not $33,858.91. The former amount apparently consists of $4,692.10 of proceeds from cottonseed sales and $33,858.91 of proceeds from cotton sales reported in 1974, and not 1973. (Evidently, petitioners make a three-cent error in their addition: $4,692.10 + $33,858.91 = $38,551.01, not $38,551.04.) Prior to the filing of the briefs, however, the parties stipulated that the amount of proceeds in controversy was $33,858.91. See Rule 91(e), Tax Court Rules of Practice and Procedure.↩
2. The contracts were identical, except for the dates, acreage, number of bales, farm number, purchase number, number of points over the 1973-1974 USDA Government loan, and witnesses. All contracts were entitled "1973 COTTON PURCHASE AND SALES AGREEMENT." The contracts were "by and between HODGES & FIELDS COTTON CO. INC. * * * BUYER, and K. D. Herndon, * * * SELLER." The contracts were signed "Hodges & Fields Cotton Co., Inc., By: Dennis Brown" and "ACCEPTED: By: Kenneth Herndon." The contracts stated that H&F agreed to purchase and petitioner agreed to deliver an approximate number of bales of cotton produced on the farm specified therein. The contracts specified the price to be paid in terms of points above the USDA Government loan, and contained other clauses regarding: Weight, compliance, cooperation, warranty and inspection. The contracts did not provide for time of delivery or method of payment. ↩
3. The contracts will sometimes be referred to as the "forward contracts." Cotton forward contracts are contracts in which farmers agree to sell a specified amount of cotton acreage at a given price, and are entered into in advance of delivery.↩
4. During 1973 and 1974, the Gin was a cooperative gin within the meaning of sec. 521, I.R.C. 1954↩, as amended. Therefore, the Gin was required to distribute all income to its partrons at the end of each fiscal year.
5. The deferred payment contracts were identical, except for the contract dates, the payment dates, and the invoice numbers. The contracts were entitled "DEFERRED PAYMENT CONTRACT." They were signed by "Grower - Kenneth Herndon" and "Farmers Co-op Gin Anson, Texas, By Dennis Brown." The contracts provided that the grower (petitioner) may deliver cotton to the Gin under the following terms: title would pass to the Gin upon delivery of the cotton; the "Price Advance" made to the grower "shall be fixed at the date the cotton is delivered" to the Gin, with the marketing of the cotton done at the Gin's discretion; "[r]egardless of the time when cotton delivered under the Deferred Payment Contract is sold by Farmers Co-op Gin, it is agreed by the parties hereto that no Advance or Payment of Any Kind will be made to the Grower prior to the date specified below;" the Gin must advance the grower the agreed upon price within 7 days of the date specified below. The dates on the contracts were Jan. 1, 1974, and Jan. 2, 1974. ↩
6. This allowed the Gin to receive the proceeds and realize interest from the purchase of interest-bearing certificates during the interim period.↩
7. H&F paid petitioner directly for all cotton not covered by a deferred payment contract, and paid the Gin for all cotton so covered. Normally, H&F paid the farmers (hereinafter sometimes referred to as the "producers") directly for the cotton, even when the payments were deferred.↩
8. Johnson admitted he was not authorized to enter into such an agreement, and at trial could not remember whether such an agreement had ever been discussed.↩
9. See Lollar v. United States, an unreported case ( N.D. Tex. 1978, 42 AFTR 2d 78↩-5882, 78-2 USTC par. 9502).
10. Petitioner initially contended that the law of "res judicata, collateral estoppel," or "stare decisis" mandated a decision in his favor. On brief, petitioner has since conceded this point. In any event, we find that these arguments lack merit. See Commissioner v. Sunnen,333 U.S. 591 (1948). Additionally, petitioner initially contended that the alleged oral agreement between Duffel and Johnson prohibited the Government from pursuing this action. Petitioner has since conceded this point as well. We consider this argument also as lacking merit. See Boulez v. Commissioner,76 T.C. 209 (1981). Accordingly, we do not further address these contentions.↩
11. We, therefore, need not consider respondent's alternative argument that petitioner constructively received the proceeds.↩
12. Any appeal by petitioner would normally lie in the Fifth Circuit. See Golsen v. Commissioner,54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985↩ (10th Cir. 1971).
13. The forward contracts executed by the parties were drafted by Mr. Wadlington. The contracts listed the gin as seller and Mr. Arnwine as grower. As the Fifth Circuit noted, however, we found (and this finding was not contested) that although the gin was named as a party, neither party intended that the gin actually buy cotton. Mr. Owens signed for the seller, Mr. Arnwine signed for the grower, and Mr. Wadlington signed for the buyer. See Arnwine v. Commissioner,696 F.2d 1102 (5th Cir. 1983), revg. 76 T.C. 532↩ (1981).
14. In Warren v. United States,613 F.2d 591 (5th Cir. 1980), the Fifth Circuit granted a judgment notwithstanding the verdict, reversing the jury verdict for the taxpayer. Like Mr. Arnwine and petitioner herein, that taxpayer was a cotton farmer in Texas. Warren involved forward contracts and deferred payment contracts similar to those at hand. In Warren, the gin acted as an intermediary between producers and cotton buyers. Additionally, the gin would, at a farmer's request, collect the sales proceeds and hold the funds until the following year. The court found, as a matter of law, that an agency relationship existed between the taxpayer and the gin. In making this determination, the court stated: The Warrens instructed the gins to solicit bids, the Warrens decided whether to accept the highest price offered, and the Warrens determined whether or not to instruct the gins to hold the proceeds from the sale until the following year. The gins' role in the sale of the cotton was to adhere to the appellees' instructions. The Warrens were the owners of the cotton held for sale; the Warrens were in complete control of its disposition. [Warren v. United States,613 F.2d at 593↩.]
15. Additionally, we note that in this case petitioner was an officer and stockholder/patron of the Gin, and was entitled to a share of the Gin's yearly profits. Arnwine↩ involved an independent gin.