**Billy E. ARNWINE and Shirley S. Arnwine, Petitioners-Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.**

**No. 81–4384.**

United States Court of Appeals, Fifth Circuit.

Jan. 31, 1983.

---

Michael L. Paup, Chief, Appellate Section, John H. Menzel, Director, Robert B. Miscavich, Senior Technician Reviewer, Tax Lit. Div., I.R.S., Glenn L. Archer, Jr., Asst. Atty. Gen., Richard W. Perkins, R. Russell Mather, Robert Pomerance, Attys., U.S. Dept. of Justice, Tax Div., Washington, D.C., for respondent-appellant.

William Norton Baker, Stephen Thomas Krier, Deborah Brown, Lubbock, Tex., for petitioners-appellees.

Before WISDOM, RANDALL and TATE, Circuit Judges.

RANDALL, Circuit Judge:

This case concerns the federal income tax consequences of loosely defined relationships among a West Texas cotton farmer anxious to shift his liability for federal income taxes on the proceeds of the sale of part of his 1973 cotton crop to 1974, the purchasers of his 1973 crop and a cotton gin anxious to be of service to all concerned. The Tax Court held that the proceeds were not taxable in 1973, finding that the cotton

gin was acting as the agent of the purchasers, rather than the farmer, when payment for the cotton was made to the gin in 1973 and that the farmer did not constructively receive the sales proceeds in 1973. *Arnwine v. Commissioner,* 76 T.C. 532 (1981). We are required by our decision in *Warren v. United States,* 613 F.2d 591 (5th Cir.1980), to reverse. We hold that the cotton gin was acting as the agent of the farmer insofar as the distribution of the proceeds from the sale of the 1973 crop was concerned and, alternatively, that the farmer constructively received the proceeds in 1973. The moral of the story is that when it comes to deferring federal income tax liability, loosely defined relationships are dangerous and may be fatal.

## I. THE FACTS AND DECISION BELOW.

During 1973, the taxpayer [1] was primarily involved in the business of cotton farming in the Levelland, Texas, area. He maintained his books and records and reported his income and expenses based upon the cash receipts and disbursements method of accounting. Owens Independent Gin, Inc. (the Gin) was an independent cotton gin in the Levelland area, owned and operated by Fred Owens (Owens). The taxpayer was not a director or an employee of the Gin. W.A. Wadlington (Wadlington) was a cotton buyer in the Levelland area representing several large purchasers. He was designated as an agent for such purposes by these purchasers and was paid on a commission basis for cotton that he purchased on their behalf. In 1973, he represented two cotton purchasers, Dan River Cotton Co., Inc. (Dan River) and C. Itoh & Co. (America), Inc. (Itoh).

Early in 1973, Wadlington contacted Owens and informed him that his principals were willing to purchase a specified number of acres of cotton to be grown and harvested in 1973. Wadlington outlined the prices that his principals would be willing to pay for cotton of varying grades and staples.

Wadlington, in turn, approached Owens with this information because he knew that Owens might be helpful in finding cotton growers who would be willing to contract for the sale to Wadlington's principals of the cotton grown on their acreage during 1973. The Tax Court found that utilizing a cotton ginner in this manner was the usual practice in the area. Because the ginner foresaw an opportunity to clinch some ginning business, he would help cotton buyers locate potential cotton sellers.

Owens contacted the taxpayer to see if he would sell some of his yet-to-be-planted 1973 cotton crop under the terms given to Owens by Wadlington. After considering this opportunity, the taxpayer informed Owens that he would be willing to make such sales. As a result of these discussions, on March 5, 1973, the taxpayer contracted to sell the cotton to be grown on certain described acreage to Dan River, and on March 13, 1973, he contracted to sell the cotton to be grown on certain other acreage to Itoh. The Dan River and Itoh contracts, which are sometimes referred to herein as the forward contracts, were virtually identical in all respects. Both contracts listed the Gin as the "Seller" and the taxpayer as the "Grower" in the heading. Both contracts were signed "For the Seller" by Owens, by the taxpayer as the "Participating Grower" and "For the Buyer" by Wadlington. The forward contracts recited that the purchaser "does herewith confirm the purchase of the entire production" on certain specific tracts of farmland. The contracts set forth the price schedule, based upon the grade and staple, which would be paid for the contract cotton when it was harvested and delivered. The contracts further provided that the cotton covered thereby was to be processed at the Gin and described the obligations of the Gin as follows:

The [Gin] is to keep records of harvesting dates on all fields and will supply the Buyer information as to the Grower's compliance to [sic] this feature of this contract.

1. Billy E. Arnwine's wife, Shirley S. Arnwine, is a party to this proceeding only by virtue of having filed a joint return with her husband.

Billy E. Arnwine will be referred to herein as the taxpayer.

The [Gin] is to make available to the buyer copies of contracts of the participating Growers which is to list their individual acres and the farm serial numbers. The buyer shall be afforded the opportunity, at his request, to examine any and all records as pertains to his interest concerning this acreage. . . .

The cotton will be invoiced to [the buyer] by the Gin as soon as it is ginned and placed on the compress. The drafts are to contain green card invoices and warehouse receipts. A copy of the invoices to W.A. Wadlington. The Cotton Board assessment shall be paid by the Gin.

The forward contracts were drafted by Wadlington. The Gin was made a party to the forward contracts because Wadlington had, in the past, been confronted with situations where the ginner had helped cotton growers try to evade their obligations under such contracts. He drafted the contracts at issue in this case in order to bind the Gin to the contract. The Tax Court found, and no one seems to contest, that the Gin was not the seller of the cotton covered under these forward contracts in spite of its designation as such in the contracts.

The taxpayer planted the cotton on the acreage covered by the contracts. While the cotton was growing, Owens kept Wadlington advised as to the status of the crop.

Upon harvesting his cotton, a cotton grower takes it to a cotton gin where he pays to have the cotton ginned. The ginned cotton is then sent to a compress where it is pressed into bales and stored. The owner of the cotton receives warehouse receipts for the cotton, i.e., negotiable bearer instruments evidencing title to the cotton stored in a warehouse. Samples from each bale are sent to the government classing office where the cotton is classified according to grade and staple. The classing office then issues classing cards (green cards) to the owner of the cotton. A green card indicates the grade of the cotton represented by a warehouse receipt.

In October and November of 1973, the taxpayer harvested the cotton from the acreage covered by the forward contracts and paid to have the cotton ginned at the Gin. Following the ginning, the Gin delivered the cotton to a warehouse and obtained warehouse receipts and green cards. The Gin maintains a separate box or drawer for each grower for whom it gins cotton and places the grower's warehouse receipts and green cards in the appropriate box or drawer when they are received. The Tax Court found that it is common practice for growers to leave their warehouse receipts and green cards in their respective boxes at the Gin until their cotton is sold. In the case of the taxpayer, the warehouse receipts and green cards for the cotton covered by the forward contracts, along with warehouse receipts and green cards for other cotton, were placed in the taxpayer's box at the Gin. The taxpayer had unrestricted access to his box at the Gin. The Tax Court found that the taxpayer's warehouse receipts and green cards for cotton that had been ginned prior to November 20, 1973 were not in the taxpayer's box immediately prior to that date.

On November 20, 1973, the taxpayer and Owens, on behalf of the Gin, executed a document entitled "Deferred Payment Contract." The deferred payment contract designated the taxpayer as the seller and the Gin as the buyer and covered 101,665 pounds of cotton listed on an attached invoice. Under the contract, the taxpayer agreed to sell and the Gin to buy that cotton at "the agreed market price on date of delivery." The contract provided that upon delivery of the cotton to the Gin, title would pass to the Gin, and the market price to be paid to the taxpayer would be fixed at the date of such delivery. The contract provided further that "[r]egardless of the time when Cotton is [sic] delivered under this Deferred Payment Contract is sold by the [Gin], it is agreed by the parties hereto that NO PAYMENT OF ANY KIND will be made by the [Gin] on account thereof prior to January 1, 1974." Finally, the contract provided that within five days after January 1, 1974, the Gin would pay to the taxpayer the full market price determined

under the contract, minus the customary charges. The contract provided for no collateral or other security for payment of the purchase price. After signing the deferred payment contract, the taxpayer turned over to the Gin, for delivery to various cotton buyers, the warehouse receipts and green cards for the cotton that had been ginned up to that time. The cotton described in the deferred payment contract included the cotton which had been sold under the forward contracts, as well as cotton that was purchased by two other buyers.

The Tax Court found, and no one argues otherwise, that the taxpayer entered into the deferred payment contract in order to defer until 1974 the receipt of income from the sale of part of his 1973 cotton crop. Most of the receipts from the sale by the taxpayer of his 1972 cotton crop had been received in 1973 because of a late harvest, and the taxpayer's attempt to delay the realization of income from the sale of his 1973 crop was motivated by a desire to avoid reporting the income from two crops in a single taxable year.

When the taxpayer delivered the cotton to the Gin, Owens, on behalf of the Gin, prepared invoices showing: (1) which bales were then in the Gin's possession (i.e., which bales were represented by warehouse receipts and green cards then in the Gin's possession); (2) the seller of the cotton being invoiced (the taxpayer); (3) the buyer of the cotton being invoiced; (4) the gross sales price of the cotton being invoiced (the number of bales times the applicable price per bale); (5) deductions from the sales proceeds for storage and for assessments of the Cotton Producers Institute; and (6) the net amount attributable to the cotton being invoiced which was payable to the taxpayer. Copies of these invoices were mailed to the taxpayer and to the buyers or, in the case of Dan River and Itoh, to their agent, Wadlington. All of the cotton at issue in this case was invoiced to Dan River or Itoh, as the case may be, during the period from November 22, 1973 through December 13, 1973.

The Tax Court found that by general custom, the Gin would handle the transfer of the cotton to the purchasers. It also received from the purchasers the proceeds from the sale of the cotton, with the implicit understanding that it would forward the appropriate amounts to the various seller-growers. The latter duty was usually accomplished by using bank drafts. The Gin would prepare a draft on the bank of a purchaser in an amount equal to the sum of the amount due to the seller-growers and the gin fees. In order to have the bank draft honored, the Gin sent the draft, warehouse receipts, green cards and applicable invoices to the purchasers (or, in the case of Dan River and .Itoh, to their agent, Wadlington) for approval. The proceeds of these drafts were held in the Gin's Bill of Exchange account (the BX account) at the Levelland State Bank. The BX account was separate from the Gin's general operating account and was used exclusively to handle this kind of cotton transaction.

The Gin received payment from the four purchasers in its BX account within ten days of the submission of each draft, and all payments due the taxpayer were received in such account prior to December 31, 1973. In January of 1974, the taxpayer received from the Gin the amount due him from the sale of the cotton covered by the forward contracts ($35,801.92), such amount being paid to him from the Gin's BX account. As compensation for services performed by the Gin for the purchasers, i.e., monitoring and reporting on the progress of the crop, taking delivery of the cotton and invoicing the cotton, the four cotton purchasers paid the Gin seventy-five cents per bale (the Gin fees).

On his 1973 federal income tax return, the taxpayer did not include in his gross income the amount received from the Gin in January of 1974, nor did he include such amount on an amended return for 1973 filed in 1978. The Commissioner determined that the taxpayer should have reported those proceeds in 1973 and assessed a deficiency of $11,656.65 in his 1973 income taxes. This litigation followed.

The Tax Court held that the taxpayer properly reported the income in 1974. The Commissioner made two arguments to the Tax Court that, had he prevailed on either, would have required that the income from the sale of the cotton be reported by the taxpayer in 1973. The first argument was that the taxpayer had constructively received the proceeds from the sale of the cotton crop in 1973. This argument was based on the premise that the deferred payment contract was not a bona fide, arm's-length agreement and thus did not shield the taxpayer from the receipt of such income in 1973. Alternatively, the Commissioner argued that the Gin was the petitioner's agent in the sale of the cotton and that the Gin's receipt of the sale proceeds was, for tax purposes, the equivalent of the taxpayer's receipt thereof.

Turning first to the argument that the deferred payment contract was not a bona fide, arm's-length agreement, the Tax Court held that the Gin, during this part of the transaction, was acting on behalf of the buyers of the cotton. The court also held that the evidence established that all of the parties—the taxpayer, the Gin and the purchasers—considered the deferred payment contract binding and that they abided strictly by its terms, and concluded that the deferred payment contract was not a sham. Having decided that the contract was bona fide and binding, the Tax Court held that the Commissioner's constructive receipt argument must fail.

Turning to the Commissioner's other argument—that the Gin was the taxpayer's agent—the Tax Court noted that a finding to that effect would mean that the income was taxable to the taxpayer in 1973, because receipt by an agent is receipt by the principal. *Williams v. United States,* 219 F.2d 523 (5th Cir.1955). The constructive receipt doctrine and the agency theory differ in that under the constructive receipt doctrine, the issue is whether proceeds not actually possessed by a taxpayer are nonetheless available to him in such a manner that his control over them is not subject to any substantial limitations or restrictions, whereas under the agency theory, the issue is whether proceeds are deemed possessed by a taxpayer by reason of possession of the proceeds by his agent. The court noted that if a taxpayer's agent for the receipt of such proceeds receives them, then any agreement between them which purports to place the proceeds beyond the taxpayer's reach is a nullity. Since the Gin's actual receipt of the proceeds from the sale of the cotton in 1973 was uncontroverted, the issue to be decided was whether, for purposes of receiving payment for the cotton, the Gin was the taxpayer's agent.

The Tax Court concluded, based upon its decision in *Schniers v. Commissioner,* 69 T.C. 511 (1977), as well as general business practice, that the Gin was not the agent of the seller of the cotton but was, instead, the agent of the purchasers. The court relied upon evidence that the purchasers contacted the Gin to locate cotton, and the Gin, in turn, contacted the taxpayer. When the Gin advised Wadlington of the progress of the cotton crop, it was acting as an agent for the purchasers. When Owens signed the deferred payment contract on behalf of the Gin as "buyer," the Tax Court held that everyone involved must have understood that he was doing so as a representative of the purchasers because all parties carried out the terms of the deferred payment contract:

> When the Gin accepted delivery of petitioner's cotton, when it performed the ministerial tasks of moving the proceeds from the sale of such cotton from the purchasers to petitioner, and when it was compensated for these services by the purchasers, it is manifest that, especially for purposes of *making payment,* the Gin was the agent of the purchasers. Here, as in *Schniers,* the Gin was not, especially for purposes of *receiving payment,* the agent of petitioner. Petitioner compensated the Gin only for ginning his cotton. He paid it nothing by way of a commission for finding purchasers for his cotton.

*Arnwine,* 76 T.C. at 544 (emphasis in original).

The Tax Court then turned to a discussion of our decision in *Warren v. United States,* 613 F.2d 591 (5th Cir.1980). In *Warren,* we held that the relationship between the gins and the taxpayers in that case for selling the cotton was that of principal and agent and concluded that the district court erred in not granting the government's motions for a directed verdict or for a judgment notwithstanding the verdict. The Tax Court found *Warren* to be distinguishable on the ground that the Gin in this case performed many more services for the purchasers than did the gins in *Warren,* and on the further ground that the purchasers in this case approached the Gin, whereas in *Warren* the sellers sought the services of the gins in order to find purchasers for the cotton.

The Tax Court also concluded that under the law of agency in Texas, the Gin was acting for the purchasers at the point when payment for the cotton was made, relying on section 14L of the *Restatement (Second) of Agency* (1957), which provides as follows:

SEC. 14L.  Ambiguous Principal

(1) A person who conducts a transaction between two others may be an agent of both of them in the transaction, or the agent of one of them only, although the agent of the other for other transactions, or the agent of one for part of the transaction and the agent of the other for the remainder.

(2) Unless otherwise agreed, one who has received money or other property from another to be paid or transferred to a creditor of the other is the agent of the other and not of the creditor.

The Tax Court noted a pertinent part of the comment to section 14L, which gives this explanation: "b. A person may be an agent for one principal for part of a transaction and an agent for the other for the remainder." The court stated that even if it were willing to hold that the Gin acted as agent for the taxpayer in securing purchases for his cotton, as this court held in *Warren, supra,* the Tax Court would nevertheless apply section 14L, and its accompanying comment, in order to fragment the transaction to determine whether the Gin was the petitioner's agent for purposes of receiving payment. The Tax Court concluded that in the portion of the total transaction when payment for the cotton was made, the Gin was not the taxpayer's agent but was, instead, the agent of the purchasers. The court noted that although the purchasers had not executed the deferred payment contract, nevertheless when the taxpayer delivered the cotton to the Gin, the Gin paid for the cotton in a manner consistent with the terms of the deferred payment contract, using funds transferred to it from the purchasers. The fees paid by the purchasers to the Gin were for a variety of services, including "invoicing" the cotton. The Tax Court considered this to be strong evidence that the Gin acted for the purchasers in paying the taxpayer for his cotton.

In summary, the Tax Court held that the taxpayer did not receive the proceeds from the sale of his cotton in 1973 through an agent; that he did not constructively receive the proceeds in 1973; and that the proceeds were, therefore, not taxable to the taxpayer in 1973. The Government appeals.

## II.  RECEIPT OF PROCEEDS BY THE TAXPAYER'S AGENT.

On appeal, the Government argues that under this court's decision in *Warren v. United States,* 613 F.2d 591 (5th Cir.1980), the largely undisputed facts in this case establish as a matter of law that the Gin was acting as the taxpayer's agent in collecting and holding the proceeds of the cotton sale. We agree.

In *Warren,* the taxpayers, also Texas cotton growers, took their cotton to two local gins for processing. Like the Gin in this case, the gins in *Warren,* as a service for their customers, would also help find buyers for their customers' cotton. As an additional service to their customers, the gins would, at their direction, "defer" the cotton by collecting the sales proceeds and holding the funds until the following year. The taxpayers in *Warren* elected to so "defer" the income from the sales of their 1969 and 1970 cotton crops. The Commissioner de-

termined that the arrangement between those taxpayers and the gins was ineffective to defer taxability on the income and assessed deficiencies in their taxes for both years. At the conclusion of the subsequent refund suit, the jury returned a verdict for the taxpayers and the district court entered judgment on the verdict. This court reversed, holding that the undisputed facts established as a matter of law that the gins were acting as the taxpayers' agents in all material aspects of the sales transaction. In so holding, this court noted that the Warrens determined whether or not to instruct the gins to hold the proceeds from the sale until the following year. This court concluded that the Warrens were the owners of the cotton held for sale and were in complete control of its disposition.

■ This court in *Warren* distinguished *Warren* from *Kasper v. Banek*, 214 F.2d 125 (8th Cir.1954), and *Amend v. Commissioner*, 13 T.C. 178 (1949). Those cases recognized that proceeds from the sale of a crop by a farmer may legitimately be deferred, for tax purposes, pursuant to a bona fide arm's-length contract between the buyer and the seller calling for payment in the taxable year following delivery of the crop. *Accord*, Rev.Rul. 58–162, 1958–1 C.B. 234. In *Warren*, however, the agreement was not between the buyer and the seller but rather between the seller and his agent. This court concluded that the Warrens' decision to have the gins hold the sales proceeds until the following year was a self-imposed limitation, not a part of the sales transaction between the buyer and the seller. Such a self-imposed limitation does not serve to change the general rule that receipt by an agent is receipt by the principal. *See Williams v. United States*, 219 F.2d 523 (5th Cir.1955). Accordingly, this court concluded that the income was received by the Warrens' agents in the year of sale, and the fact that the Warrens restricted their access to the sales proceeds did not change the tax status of the money received.

■ We agree with the Government that the facts in this case similarly leave no room for doubt that contrary to the Tax Court's determination, the Gin was acting solely on the taxpayer's behalf and at his direction, at least with respect to the distribution of the sales proceeds, which is the critical portion of the transaction for tax purposes. The taxpayer testified that the sole purpose for the deferred payment arrangement was to shift his liability for taxes on the income from 1973 to 1974. While this is not a forbidden purpose, it is a signal that the transaction should be scrutinized for economic reality. In this case, the testimony indicates that the deferral arrangement was devised solely by the taxpayer and Owens, president of the Gin. The uncontradicted testimony of Wadlington, as well as that of B.F. Tipton and M.C. Harliss (vice presidents of Dan River and Itoh, respectively), establishes that the buyers were not privy to the deferral agreement and had not even been apprised of the fact that such an arrangement had been attempted. Further, Wadlington, Tipton and Harliss testified that Owens had not been given the express or implicit authority to enter into such an agreement on the purchasers' behalf. The Gin's authority, insofar as payment for the cotton was concerned, was limited to the act of invoicing the cotton as it was delivered to the Gin for processing. In view of the fact that the purchasers did not even know about, much less authorize, the deferral arrangement, it cannot be said that the Gin was acting as their agent in that aspect of the transaction.

The Tax Court attempted to distinguish *Warren* on the grounds that the Gin here provided "many more" services for the purchasers than did the gins in *Warren* and that the "purchasers involved here approached the Gin, whereas in *Warren* the seller sought the services of the gins to find purchasers for the cotton." Even if those statements were accurate, the factors described do not serve to distinguish *Warren*. The critical economic relationship between the taxpayer and the Gin relating to the distribution of the sales proceeds is in all material respects identical to that which this court in *Warren* found to be indisputably that of principal and agent. The tax-

payer maintained full control of the disposition of the proceeds of his cotton, and the basic function of the Gin was to follow his instructions with respect to those proceeds.

■ The Tax Court correctly recognized that under Texas law, particularly the provisions of the *Restatement (Second) of Agency* (1957), referred to *supra,* the Gin could be characterized as an agent for purposes of one aspect of the transaction, but not for purposes of other aspects of the transaction. But the Tax Court went on to conclude that the Gin was not the taxpayer's agent for the purpose of distribution of the sales proceeds. In *Warren,* however, the gins also collected and distributed the sales proceeds in accordance with the deferral agreements with the taxpayers and the purchasers also paid the gins for various services. While it is true that the Gin was responsible, at the direction of the buyers, for "invoicing" the cotton, that does not evidence the delegation of any authority or responsibility to the Gin by the buyers with respect to deferral of the payment of the sales proceeds.

■ On appeal, the taxpayer argues, in defense of the Tax Court's decision, not that the Gin had actual authority from the buyers to enter into the deferred payment contract on their behalf, but rather that the Gin had implied or apparent authority to bind the buyers to the deferred payment contract, such implied or apparent authority arising from the performance by the Gin of certain services for the buyers, such as monitoring the progress of the crops and invoicing the cotton after harvest. However, the doctrine of apparent authority has no application here because the taxpayer did not enter into the deferred payment contract in reliance upon the Gin's supposed authority to bind the cotton companies to such an arrangement. *See Rourke v. Garza,* 530 S.W.2d 794, 802–04 (Tex.1976). The deferred payment contract was executed by the taxpayer and by the Gin acting in its own name. It made no mention of the forward contracts or the buyers thereunder. It was not approved by, or even disclosed to, the buyers. The deferred payment con-

tract did not even purport to alter any obligation of the buyers under the forward contracts to make payment for the cotton upon delivery. On the contrary, the deferred payment contract was made at the taxpayer's direction and solely for his benefit. He defined the terms of the arrangement and unilaterally chose the Gin to hold the money rather than some other stakeholder, and the Gin complied with his wishes. We agree with the Government that the only reasonable view of the matter is that the Gin was acting as the taxpayer's agent with respect to the collection and distribution of the sales proceeds, and the Tax Court's ruling to the contrary is in error.

The taxpayer appears to take special comfort from our decision in *Busby v. United States,* 679, F.2d 48 (5th Cir.1982), a decision which was rendered after the original briefing in this case. But rather than aiding the taxpayer, *Busby* harms him. *Busby* was also a case involving the deferral of income from a cotton crop until the year after the crop was harvested and delivered to the buyer. But unlike this case, in *Busby* the taxpayers had emphasized, from the very beginning of the transaction, the importance of deferred payment and had conditioned the sale upon it. The gin in *Busby* agreed to take care of the matter and established an irrevocable escrow account in a bank. Under the terms of the agreement, the buyer was to deposit the proceeds of sale into the escrow account following delivery of the cotton. The taxpayers had no right to receive the monies held by the bank until the following year. Further, they were not entitled to receive any incidental benefits from the account, such as interest or the issuance of a letter of credit. The district court held that there was no evidence to support a finding that the gin in *Busby* agreed on behalf of the buyer to deposit the money in escrow for the benefit of the taxpayers. This court reached the opposite conclusion. It noted that the buyer was not ignorant of the agreement, but had instead received a copy of it from the Gin. Further, the buyer had to approve the

drafts prepared by the Gin for the payment for the cotton. This court in *Busby* distinguished *Warren* on the basis that the relationships between the parties in *Busby* were markedly different from the relationships between the parties in *Warren,* noting that in *Warren* the agreement to defer payment was not between the buyer and the seller but rather between the seller and his agent.

In summary, we agree with the Government that the facts in this case admit of only one conclusion—that the Gin was acting as agent for the taxpayer insofar as the distribution of the proceeds from the sale of the cotton was concerned. Since receipt by an agent is receipt by the principal, *see Williams v. United States,* 219 F.2d 523 (5th Cir.1955), the fact that the Gin received the proceeds in 1973 renders those proceeds taxable to the taxpayer in that year.

### III. CONSTRUCTIVE RECEIPT.

On appeal, the Government also argues that the taxpayer constructively received the proceeds from the sale of the cotton in 1973 and is accordingly taxable on those proceeds in that year. Cash basis taxpayers are required to include items of income in the taxable year in which such income is actually or constructively received by them. I.R.C. § 451(a); Treas.Reg. § 1.451–1(a). Treasury Regulation 1.451–2(a) provides that a cash basis taxpayer will be deemed to be in constructive receipt of income when it becomes available to him without substantial restrictions. *See also Williams v. United States,* 219 F.2d 523 (5th Cir.1955). The Tax Court concluded that the record in this case did not support the Commissioner's claim that the deferred payment contract should be disregarded because it was not a "substantial limitation" on the taxpayer's access to the proceeds. The Tax Court held that all of the parties considered the deferred payment contract binding and abided by its terms. The record here establishes, however, that the taxpayer's cotton was delivered to the purchasers in 1973 and that the purchasers not only made the proceeds available to the taxpayer without restriction or qualification but also paid the proceeds over to the Gin in accord-

ance with the taxpayer's wishes immediately upon delivery. The only restriction on the taxpayer's access to the funds from that point forward was his agreement with the Gin. The purchasers did not participate in or even know about the deferral arrangements. Accordingly, we agree with the Government that the deferred payment contract formed no part of the original sales agreement between the taxpayers and the purchasers and was exactly the type of "self-imposed limitation" that this court in *Warren* held to be legally insufficient to shift taxability from one year to the next. *See Williams, supra.*

Further, there was no showing at trial that the deferred payment contract was a "substantial limitation" on the taxpayer's access to the proceeds once they were collected by the Gin. The taxpayer testified that the deferred payment contract was drawn only to give him something to show the Internal Revenue Service. Owens, president of the Gin, testified that the taxpayer, as a practical matter, could have obtained part or all of the funds collected by the Gin upon request.

Even if the Gin had not been willing to distribute the funds to the taxpayer, it seems clear that the taxpayer constructively received the proceeds. The taxpayer's right to payment for his cotton was defined by the forward contracts, which did not provide for deferral of payment. The subsequent agreement by the Gin to hold that money for the taxpayer did not alter the taxpayer's right, vis-a-vis the purchasers, to receive payment promptly. The deferred payment contract purports to be a contract for the sale of cotton by the taxpayer to the Gin, but it is clear that the parties never intended to enter into a valid sales contract. The cotton covered by the deferred payment contract was the same cotton as had been sold by the taxpayer to the four cotton companies (including Dan River and Itoh) who actually purchased the cotton. The taxpayer was clearly in no position to sell that cotton to the Gin, as the Gin was well aware. Further, Owens testified that the Gin did not purchase any of this cotton on

its own account. Thus, the only benefit that Owens derived from the transaction, aside from the seventy-five cent bale fee, was the ginning business for which he was compensated. Accordingly, there was no valid sales contract, and the deferred payment contract thus represented at most a unilateral promise by the Gin to hold the proceeds until January, 1974. Under these circumstances, such a promise could not have created any right in the Gin to refuse to give the taxpayer his money on demand. Thus, it cannot be said to have imposed a "substantial limitation" upon the taxpayer's access to the funds.

## IV. CONCLUSION.

In summary, we hold that the Gin was acting as the taxpayer's agent insofar as the distribution of the proceeds from the sale of the 1973 crop was concerned and, alternatively, that the taxpayer constructively received the proceeds in 1973. The judgment of the Tax Court is

REVERSED.