**John E. REED, Petitioner, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.**

No. 83–1253.

United States Court of Appeals,
First Circuit.

Argued Oct. 3, 1983.

Decided Dec. 5, 1983.

John M. Peterson, Jr., San Francisco, Cal., with whom Baker & McKenzie, San Francisco, Cal., was on brief, for petitioner, appellant.

Melvin E. Clark, Jr., Atty., Tax Div., Dept. of Justice, Washington, D.C., with whom Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, and Richard W. Perkins, Attys., Tax Div., Dept. of Justice,

Washington, D.C., were on brief, for respondent, appellee.

Before CAMPBELL, Chief Judge, GIBSON *\* and TIMBERS \*\*, Senior Circuit Judges.

FLOYD R. GIBSON, Senior Circuit Judge.

John E. Reed. appeals from the United States Tax Court's decision sustaining the Commissioner's determination of a $71,-412.68 deficiency in Reed's 1973 federal income tax. On appeal to this court, Reed, a cash basis taxpayer, claims the Tax Court erred as a matter of law in ruling that he recognized a long-term capital gain from the sale of 80 shares of stock in 1973, when the stock purchaser deposited the stock sales proceeds into an escrow account, rather than in 1974, when the escrowee disbursed the sales proceeds to Reed. Reed urges that the escrow account was a valid income deferral device because: 1) the account was set up under a bona fide agreement between Reed and the stock purchaser providing for deferred payment of the sales proceeds; 2) Reed was not entitled to receive any incidental benefits from the escrow account in 1973; and 3) the escrowee was not Reed's agent. We agree with

Reed's contentions and therefore reverse the Tax Court's assessment of the $71,-412.68 deficiency.

## I.  Background

The parties have stipulated to most of the relevant facts. Reed acquired stock in Reed Electromech Corporation (Electromech) in 1963, when he headed up an investor group which organized Electromech to purchase the assets of another corporation. In 1967, Reed and several of his fellow Electromech shareholders (the selling stockholders) entered into an agreement with Joseph Cvengros, also an Electromech shareholder, granting Cvengros an option to purchase the selling stockholder's stock, or to cause the selling shareholders to purchase Cvengros' stock. The agreement, as amended on October 16, 1973,[1] set a $3,300 per share price, for an aggregate price of $808,500.00, and provided that if Cvengros failed to exercise his purchase option by November 27, 1973, the selling shareholders could purchase all of Cvengros' stock at the set per share price.[2] The amended agreement further provided that whether Cvengros purchased the selling stockholder's stock, or *vice versa,* the closing would be on December 27, 1973, at which time the stock and purchase price were to be delivered.

---

\* Of the Eighth Circuit, sitting by designation.

\*\* Of the Second Circuit, sitting by designation.

1.  The agreement, as amended, provided in relevant part:

    1.  Each of the [sellers] hereby agree [*sic*], severally and not jointly, to sell to Cvengros or his designees, the Common Shares of [Electromech] owned by such [seller] * * * at a purchase price of $3300 per share, or an aggregate of 245 common shares of [Electromech], $100 par value, * * * at an aggregate sales price of $808,500.

    2.  Until the close of business on November 27, 1973, Cvengros shall have the right, but not the obligation, to purchase all, but not less than all of the [sellers'] Shares at a purchase price of $3300 per share. * * *
    
    &ast; &ast; &ast; &ast; &ast; &ast;

    11.  Closing * * * [s]hall take place * * * on December 27, 1973 * * *. At the Closing, the following action shall be taken and shall be deemed to have occurred simultaneously:
    
    A.  The common shares of [Electromech] to be delivered * * * shall be delivered free

and clear of all liens, charges and encumbrances in duly transferable form, that is, together with executed stock powers, signatures guaranteed.

B.  The aggregate purchase price * * * shall be delivered to the person or persons who are selling their shares of [Electromech] by cashiers or certified check.

2.  At the time the amended agreement was executed on October 16, 1973, the outstanding stock of Electromech was owned as follows:

| Shareholder | Number of Shares Owned |
|---|---|
| Joseph M. Cvengros | 105 |
| John C. Reed | 80 |
| John E. Reed, Trustee | 20 |
| Elizabeth C. Reed | 20 |
| Stewart B. Reed | 20 |
| Lucile H. Thomee | 35 |
| William W. Stifler | 10 |
| E. Herbert Burk | 25 |
| Edward F. Bridgman | 35 |
| Total | 350 |

On November 23, 1973, Cvengros exercised his option to purchase the Electromech stock held by the selling shareholders. Shortly thereafter, Reed and his fellow selling shareholders became concerned about the federal income tax implications of a sale in 1973. Reed, in particular, wanted to defer closing until 1974 so that he would have time to make an orderly sale of certain securities ("loss securities"), the capital loss from which he desired to write-off against the capital gain on the Electromech sale. Reed was understandably reluctant to sell the loss securities prior to the December 27 closing, fearing that Cvengros' outside financing might fall through before the closing, thus preventing the Electromech stock sale. On the other hand, Reed believed that after the December 27 closing there would not be enough time remaining in 1973 to properly identify and sell these loss securities in that year. Hence, Reed wanted to postpone closing until January of 1974.

Nevertheless, Cvengros and his financial backer insisted on the December 27, 1973 closing, apparently because the financial backer wanted the stock transaction reflected on his 1973 books. In early December 1973, Reed[3] and Cvengros, desiring to accomodate all involved, orally agreed to modify the purchase-sale agreement to provide that: 1) Reed and the other selling shareholders would not be entitled to receive payment for their stocks until January 3, 1974; and 2) Reed would remain on Electromech's Board of Directors after the stock sale. Both Reed and Cvengros considered the deferred payment provision to be part of the purchase/sale agreement and legally binding. Reed, in fact, indicated that he would not have gone through with the sales transaction if Cvengros had not agreed to the deferred payment provision.

This oral modification was memorialized in a written escrow agreement, executed by Reed and Cvengros immediately prior to the closing on December 27, 1973. Under the terms of the escrow agreement, the stock sales proceeds were to be paid by Cvengros to the escrowee (the American National Bank and Trust Company) at the December 27, 1973 closing and the escrowee was then to make disbursements of the sales proceeds to a number of selling shareholders, including Reed, on January 3, 1974. Under the agreement, these selling shareholders were not entitled to receive interest, investment income or any other incidental benefits (e.g., bank letter of credit) on the sales proceeds while they were in escrow. The agreement provided for no conditions precedent, other than the passage of time, to the January 3, 1974 payment.

At the closing on December 27, 1973, the following events occurred: 1) Cvengros' financial backer loaned and delivered to Cvengros a cashier's check in the amount of $808,500 payable to the order of Cvengros; 2) Cvengros endorsed and delivered the $808,500 check to the escrowee; and 3) the selling shareholders delivered their Electromech stock to Cvengros. The escrowee subsequently disbursed the sales proceeds pursuant to the escrow agreement instructions; hence Reed did not actually receive his share of the proceeds until January 3, 1974. Reed realized a long-term capital gain of $256,000 on the sale of his Electromech stock. This gain was reported on his 1974 Federal Income Tax Return.

In the Tax Court, the Commissioner argued that Reed recognized a taxable gain from the sale in 1973 rather than in 1974 because: 1) he constructively received the income from the stock sale in 1973; 2) he received an economic benefit (or cash equivalent) in 1973; and 3) the escrow arrangement lacked economic reality, other than as a tax deferral device. Reed, a cash basis taxpayer, claimed the gain was taxable in 1974 because he did not actually or constructively receive payment in 1973. He urged then, as he does now, that the escrow arrangement was a valid income deferral device because it was part of a bona fide modification of the purchase-sale agreement with Cvengros. Under that modifica-

---

**3.** Reed was acting as the agent and attorney in fact for the rest of the selling shareholders in connection with their sale of Electromech stock to Cvengros.

tion, Reed was not entitled to receive any payment until January 3, 1974.

The Tax Court, while recognizing that a cash basis taxpayer such as Reed could postpone income recognition by a bona fide agreement providing for deferred payment, nevertheless held that "when, upon receipt of the [purchased stocks], the buyer deposits the full purchase price in an escrow account to be paid to the seller at a later date and no condition other than the passage of time is placed on the seller's right to receive the escrow funds, courts have held that the seller recognizes income when the buyer deposits funds with the escrowee." *Reed v. Commissioner,* Tax Ct.Mem.Dec. (P–H) (¶ 82,734) (1983) (citations omitted). The court emphasized that because nothing could have prevented Reed's receipt of the funds once they were deposited with the escrowee, Reed recognized income when Cvengros deposited the funds in escrow in 1973.

## II.  Discussion

The Commissioner argues that the Tax Court's ruling is supported by three separate doctrines: the constructive receipt doctrine, the economic benefit doctrine, and the doctrine that receipt of income by the taxpayer's agent is receipt by the taxpayer. Though these doctrines invariably overlap, as evidenced by the Tax Court's apparent reliance on a hybrid of the constructive receipt and economic benefit doctrines, we will address each separately.

### A.  Constructive Receipt

The Commissioner contends Reed constructively received the stock sales proceeds when they were deposited in the escrow account on December 27, 1973. A cash basis taxpayer such as Reed is required to recognize income from the sale of property in the taxable year in which he actually or constructively receives payment for the property. 26 U.S.C. § 451(a) (1954); Treas. Reg. § 1.451–1(a). Treasury Regulation § 1.451–2(a) explains the constructive receipt doctrine as follows:

Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year dur-

ing which it is credited to his account, *set apart for him, or otherwise made available so that he may draw upon it at any time,* or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. *However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.*

(Emphasis added).

Thus, under the constructive receipt doctrine, a taxpayer recognizes taxable income when he has an unqualified, vested right to receive immediate payment. *Ross v. Commissioner,* 169 F.2d 483, 490 (1st Cir.1948); *Amend v. Commissioner,* 13 T.C. 178, 185 (1949); Metzer, *Constructive Receipt, Economic Benefit and Assignment of Income: A Case Study in Deferred Compensation,* 29 Tax L.Rev. 525, 531 (1974). However, a taxpayer-seller has the right to enter into an agreement with the buyer that he, the seller, will not be paid until the following year. *Schniers v. Commissioner,* 69 T.C. 511, 516 n. 2, 517–18 (1977). As long as the deferred payment agreement is binding between the parties and is made prior to the time when the taxpayer-seller has acquired an absolute and unconditional right to receive payment, then the cash basis taxpayer is not required to report the sales proceeds as income until he actually receives them. *Id.; Oates v. Commissioner,* 18 T.C. 570, 584–85 (1952); *aff'd* 207 F.2d 711 (7th Cir.1953); *Glenn v. Penn,* 250 F.2d 507, 508 (6th Cir.1958); *Commissioner v. Tyler,* 72 F.2d 950, 952 (3rd Cir.1934); *Amend,* 13 T.C. at 185.

Applying the language of Treasury Regulation § 1.451–2(a) quoted above, if the deferred payment agreement provides that the taxpayer-seller has no right to payment until the taxable year following the sale, then the income received from the sale is not "set apart for him, or otherwise made available so that he may draw upon it" in the year of the sale. *See Schniers,* 69 T.C. at 516. Alternatively stated, such a deferred payment agreement restricts the time of payment and therefore serves as a

"substantial limitation" on the taxpayer control of the proceeds in the taxable year of the sale. *See Tyler,* 72 F.2d at 952.

■ Hence, as the parties agree and the Tax Court stated, courts have generally recognized that a cash basis taxpayer-seller may effectively postpone income recognition through the use of a bona fide arms-length agreement between the buyer and seller calling for deferred payment of the sales proceeds. *See Busby v. United States,* 679 F.2d 48, 49–50 (5th Cir.1982); *Tyler,* 72 F.2d at 952; *Oates,* 207 F.2d at 713; *Kasper v. Banek,* 214 F.2d 125, 127 (8th Cir.1954); *Glenn,* 250 F.2d at 508; *Schniers,* 69 T.C. at 516; *Amend,* 13 T.C. at 184–85. *Compare Arnwine v. Commissioner,* 696 F.2d 1102, 1111–12 (5th Cir.1983); *Warren v. United States,* 613 F.2d 591, 593 (5th Cir.1980) (agreement between seller and his agent for deferral of payment ineffective to defer income recognition).

■ Similarly, an existing agreement which has been amended or modified to provide for deferred payment of an amount not yet due serves to postpone income recognition. *Oates,* 18 T.C. at 585; 207 F.2d 712–14. *Goldsmith v. United States,* 586 F.2d 810, 817, 218 Ct.Cl. 387 (1978); *Commissioner v. Olmstead, Inc.,* 304 F.2d 16, 21–2 (8th Cir.1962). This is true even though: 1) the purchaser was initially willing to contract for immediate payment; and 2) the taxpayer's primary objective in entering into the deferred payment agreement was to minimize taxes. *Goldsmith,* 586 F.2d 819; *Schniers,* 69 T.C. 517–18; *Cowden v. Commissioner,* 289 F.2d 20, 23, 23 n. 1 (5th Cir.1959).[4] A deferred payment agreement is considered bona fide and hence given its full legal effect, if the parties intended to be bound by the agreement and were, in fact, legally bound. *Oates,* 18 T.C. at 585; *Schniers,* 69 T.C. at 516–18.

While recognizing these principles, the Commissioner claims the escrow modification providing for disbursement of the sales proceeds to Reed in 1974 was not a bona fide arms-length agreement between the Cvengros and Reed and, hence, did not "substantially limit" Reed's access to the sales proceeds deposited in escrow after the December 27, 1973 closing. Instead, the purported escrow modification was nothing more than Reed's self imposed limitation, designed to defer income recognition on proceeds he already had an unqualified, vested right to receive on December 27, 1973. The Commissioner claims the record reveals that Reed could have taken the sales proceeds immediately after the December 27, 1973 closing, had he so requested.

■ We agree with the Commissioner that a deferred escrow arrangement that is not part of a bona fide agreement between the buyer and the seller-taxpayer, but rather is a "self-imposed limitation" created by the seller-taxpayer, is legally ineffective to shift taxability on escrowed funds from one year to the next. *See Williams v. United States,* 219 F.2d 523, 527 (5th Cir.1953); *Arnwine,* 696 F.2d at 1107; *Warren,* 613 F.2d at 593. However, in this case the escrow arrangement was the product of an arms-length, bona fide modification to the purchase sale agreement between Reed and Cvengros; it was not Reed's self imposed limitation on the receipt of sales proceeds he had an unqualified, vested right to receive in 1973.

The modification setting up the escrow arrangement was orally agreed upon by the parties in early December, 1973, and, as the Tax Court found, was memorialized in the escrow agreement instruction letter executed prior to closing on December 27, 1973. Thus, the modification became effective prior to the time when Reed had an unqualified right to demand immediate payment under the then existing purchase agreement. As discussed above, an existing purchase-sale agreement can be modified to provide for deferred payment of an amount

---

4. As Judge Learned Hand stated in *Helvering v. Gregory,* 69 F.2d 809, 810 (2nd Cir.1934) *aff'd* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935): "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes".

not already due under the existing agreement, provided the modification is considered by the parties to be legally binding. *Oates,* 18 T.C. at 585; 207 F.2d 712–19; *Goldsmith,* 586 F.2d at 817. Both Cvengros and Reed testified that they considered the deferred payment provision to be a legally binding modification, defining their rights and obligations under the purchase-sale agreement. Nothing in the Tax Court's opinion indicates that we should discredit this testimony. In fact, the record reveals that the provision was the product of some arms length negotiations between Cvengros and Reed. Cvengros, at his financial backer's insistance, was initially unwilling to make the deferred payment but agreed to the escrow device after Reed promised to remain on the Electromech Board of Directors following the sale to insure a smooth ownership transaction. And, despite the government's suggestion, on the record here we are unable to say that the deferred payment agreement was any less bona fide or any less a part of the purchase-sale agreement merely because it was not memorialized until just prior to closing.

The Commissioner relies heavily upon *Williams v. United States,* 219 F.2d 523 (5th Cir.1955) in support of its claim that the escrow arrangement here amounted to a "self-imposed", rather than "substantial", limitation on the taxpayer's access to the sales proceeds in 1973. However, the *Williams* case is clearly distinguishable and does not control here. In *Williams,* the seller-taxpayer entered into an agreement to sell timber to a lumber company for a cash price. After the sale contract was executed, the taxpayer-seller decided, for tax reasons, that he wanted to receive part of the purchase payment in four installments in later years. The taxpayer himself prepared an escrow agreement naming the bank as the escrow agent and the taxpayer personally secured the bank's approval of the arrangement. The *Williams* court, emphasizing that the escrow arrangement was unilaterally set up by the seller-taxpayer, concluded that under the terms of the purchase agreement, the entire purchase price

became available to the taxpayer upon completion of the sale. *Id.* at 527.

Unlike in *Williams,* the escrow arrangement here was not unilaterally imposed by Reed, but rather was part of a bona fide modification to the purchase-sale agreement between Reed and Cvengros. Under that agreement, as modified, the purchase price did not become available to Reed until the taxable year following the year of the sale.

The instant case is thus much closer to another Fifth Circuit case, *Busby v. United States,* 679 F.2d 48 (5th Cir.1982), involving a cotton farmer's use of an escrow device to defer income from the sale of a cotton crop until the year after it was harvested and delivered to the buyer. In *Busby,* the taxpayer-farmer emphasized the importance of a deferred payment and conditioned the sale upon it. Accordingly, the cotton gin, the buyer's purchasing agent, agreed to establish an irrevocable escrow account in a bank. Under the terms of purchase agreement, the buyer was to deposit the proceeds of the sale into the escrow account following the delivery of the cotton in 1973. The escrowee was to then pay the purchase price to the farmer in 1974. Once the purchase price had been deposited with the escrowee in 1973, there was no condition on the farmer's receipt of the funds other than the passage of time. The 5th Circuit in *Busby* concluded that there was an arms length agreement to defer payment which was effective to shift the farmer's tax on the proceeds until the year following the sale. *Id.* at 50.

The only notable distinction between *Busby* and this case is that the deferred payment arrangement in this case was part of a modification of the original purchase-sale agreement. However, as we discussed above, this distinction is not controlling where, as here, the modification was bona fide and became binding prior to the time when the taxpayer's right to immediate payment had vested.

Another case sanctioning the use of an escrow arrangement to defer income recognition is *Commissioner v. Tyler,* 72 F.2d 950

(3rd Cir.1934). In *Tyler,* the taxpayer sold corporate stock under a deferred payment contract calling for the delivery of stock to the purchaser in December of 1927 and the payment of the purchase proceeds to the taxpayer in January, 1928. As provided under the agreement, in November, 1927, the taxpayer delivered stock to an escrowee. In December, 1927, the escrowee delivered the stock to the purchaser and the purchaser in turn deposited the purchase price with the escrowee. The escrowee then paid the purchase proceeds to the taxpayer in January of 1928. The *Tyler* court held that the taxpayer did not recognize income from the sale of stock in the taxable year 1927. The court held:

> The doctrine of constructive receipt is applicable only when there is *no substantial limitation or restriction as to the time of payment to the taxpayer. The deposit agreement, however, does limit and restrict the time of payment,* since it specifically provides that the depositing shareholders are not to receive any money until after January 1, 1928. They could neither demand their share nor control its disposition prior to that date. Under the agreement, the [taxpayers] could not and did not in fact or constructively receive the money for their shares until 1928. We are of the opinion, therefore, that the Board of Tax Appeals did not err in holding that the income was earned in 1928, and that the profit therefrom was taxable in that year.

72 F.2d at 952 (emphasis added).

Similarly, in the instant case, and in *Busby,* the taxpayer's right to demand payment of the escrowed purchase proceeds in the year of the sale was restricted by a binding agreement with the purchaser requiring that payments to the taxpayer be made the following year. *See Harold W. Johnston v. Commissioner,* 14 T.C. 560, 565 (1950) (sales proceeds held by escrowee under deferred payments agreement not subject to taxpayer's immediate demand and hence not constructively received by taxpayer). Under

Treasury Regulation § 1.451–2(a), such an agreement, even though it restricts only the time of payment, serves as a "substantial limitation" on the taxpayer's right to demand payment of the escrowed purchase proceeds in the year of the sale. *See* McDonald, *Deferred Compensation: Conceptual Astigmatism,* 24 Tax L.Rev. 201, 204 (1969) ("[Section 1.451–2(a)] does not say that income is constructively received merely because its eventual payment is not subject to conditions of restrictions; the central consideration is whether the taxpayer's control of the time of its payment is subject to restrictions or limitations.")

Furthermore, as quoted above, Treasury Regulation § 1.451–2(a) also provides that income is recognized by a cash basis taxpayer "in the taxable year during which it is credited to his account, set apart for him, *or otherwise made available so that he may draw upon it at any time."* (Emphasis added). Here, as in *Busby* and *Tyler,* the binding deferred payment agreement between the purchaser and seller prevented the taxpayer from "drawing" upon the escrowed funds in the year of the sale. *See Johnston,* 14 T.C. at 565.

## B. Economic Benefit

The Commissioner next contends that in 1973 Reed received a taxable economic benefit by virtue of Cvengros' deposit of the sales proceeds into the escrow account. The Commissioner argues that upon the December 27, 1973 closing, there were no open transactions remaining and Reed's right to future payment from the escrow account was irrevocable, being conditioned only upon the passage of time; hence, Reed received the "cash equivalent" of the sales proceeds deposited in the escrow account. The Commissioner points out that Reed could have assigned his irrevocable right to receive future payment of the escrow funds.

This argument, which was largely embraced by the Tax Court, is predicated upon a misapplication of various cases the Commissioner says espouse the economic benefit

doctrine. *See Kuehner v. Commissioner,* 214 F.2d 437, 440–41 (1st Cir.1954); *Williams v. United States,* 219 F.2d 523, 527 (5th Cir.1955); *Watson v. Commissioner,* 613 F.2d 594, 597 (5th Cir.1980); *Oden v. Commissioner,* 56 T.C. 569, 575 (1971); *Pozzi v. Commissioner,* 49 T.C. 119 (1967). These cases held that escrow arrangements were ineffective to defer income tax because of the existence of one of two factors, not present in the instant case: (1) the taxpayer received some present, beneficial interest from the escrow account; *see Kuehner,* 214 F.2d at 440 (investment income); *Watson,* 613 F.2d at 597 (letter of credit); *Pozzi,* 49 T.C. at 127–28 (interest income); (2) the escrow arrangement was the product of the taxpayer's self-imposed limitation on funds the taxpayer had an unqualified, vested right to control. *See Williams,* 219 F.2d at 526–27 (escrow was self-imposed limitation); *Oden,* 56 T.C. at 577 (same).

Specifically, *Kuehner,* the First Circuit case upon which the Commissioner principally relies, held that a taxpayer recognized income when the purchase price was deposited with the escrowee because the taxpayer's interest in the escrowed funds constituted a property interest equivalent to cash. The taxpayer's interest in the escrow fund was so viewed because the taxpayer was entitled to investment income earned while the funds were in escrow and hence enjoyed a complete and present economic interest in the funds. As the court stated:

> Under the terms of the 1947 agreement the interest from the invested [escrow fund] was payable to the petitioner. The Trustee's duties were ministerial and the economic benefits of the [escrow] fund held by it belonged to the [taxpayer].

214 F.2d at 440.

■ By contrast, in this case Reed was not entitled to receive the income earned from the investment of funds held by the escrowee, but merely obtained an uncondi-

tional promise that he would ultimately be paid on January 3, 1974 in accordance with the deferred payment provision.

The Commissioner, however, seizes upon broad language in *Kuehner* as support for the proposition that one who has an unconditional right to future payment from an irrevocable escrow account receives taxable income in the year the escrow account was created.[5] There are three reasons why we do not interpret *Kuehner* as supporting this proposition. First, as the *Kuehner* court apparently recognized, the deposited escrow funds could be characterized as "the equivalent of cash" only if the taxpayer received a present beneficial interest in such funds— e.g., investment income. The *Kuehner* court's discussion of the taxpayer's present, beneficial interest in the escrow funds would have been superfluous if it were holding that the taxpayer's unconditional right to future payment of such funds was the equivalent of cash. Hence, we believe it is reasonable to interpret the *Kuehner* court's discussion of the unconditional nature of a right to future payment as relating to the court's determination of the appropriate value of the economic benefit conferred, the court having determined that the taxpayer had received a present economic benefit.

■ Second, to apply the Commissioner's interpretation of *Kuehner* to this case would be at odds with the well established principle that a deferred payment arrangement is effective to defer income recognition to a cash basis taxpayer, provided it is part of an arms-length agreement between the purchaser and seller. That the cash basis taxpayer's right to receive future payment of the escrowed proceeds may be characterized as unconditional or irrevocable does not render the contractually binding restriction on the time of payment any less substantial. *See Tyler,* 72 F.2d at 952; *Busby,* 679 F.2d at 50; *Johnston,* 14 T.C. at 565; *Amend,* 13 T.C. at 184.

---

**5.** This proposition was rejected by the Tax Court in *Johnston,* 14 T.C. at 565.

Third, to apply the Commissioner's interpretation of *Kuehner* here would require an extension of the economic benefit doctrine that would significantly erode the distinction between cash and accrual methods of accounting. The economic benefit doctrine, a nonstatutory doctrine emerging from and primarily related to the area of the employee deferred compensation, is based on the idea that an individual should be taxed on any economic benefit conferred upon him, to the extent that the benefit has an ascertainable fair market value. Metzer, *Constructive Receipt, Economic Benefit and Assignment of Income: A Case Study in Deferred Compensation,* 29 Tax L.Rev. 525, 550 (1974); *see also Goldsmith,* 586 F.2d at 820.[6] However, in applying the economic benefit doctrine to a cash basis taxpayer's contractual right to receive future payment, as we must do here, courts generally go beyond an inquiry into the fair market value of the contract right to ask the separate question of whether the contract right is the equivalent of cash. *See Johnston,* 14 T.C. at 565–66; *Western Oakes Bldg. Corp. v. Commissioner,* 49 T.C. 365, 376 (1968); *Nina J. Ennis v. Commissioner,* 17 T.C. 465, 469–70 (1951); *see also* Davies, *A Model for Corporate Income Tax,* 124 U.Pa.L.Rev. 299, 320–22 (1975). Without this separate inquiry, the economic benefit doctrine, as applied to a cash basis taxpayer, could be broadly construed to cover all deferred compensation and deferred payment contracts.[7]

In order to meet the cash equivalency requirement for income recognition, a cash basis taxpayer's contractual right to future payment must be reflected in a negotiable note, bond, or other evidence of indebtedness which, like money, commonly and readily changes hands in commerce. *Johnston,* 14 T.C. at 565–70; *Western Oaks,* 49 T.C. at 377; *Ennis,* 17 T.C. at 469–70; *cf. Cowden v. Commissioner,* 289 F.2d 20, 24 (5th Cir.1961) (contractual promise to pay must be "unconditional and assignable, not subject to set-offs, and . . . of a kind that is frequently transferred to lenders or investors at a discount not substantially greater than the generally prevailing premium for the use of money . . . .").[8] And, in addition to being readily transferrable, the evidence of indebtedness received by the taxpayer must be intended as present payment of the amount owed, rather than merely as evidence that payment will be forthcoming in the future. *Davies, A Model for Corporate Income Tax,* 124 U.Pa.L.Rev. 323–24; *Schlemmer v. United States,* 94 F.2d 77, 78 (2nd Cir.1938) (promissory note given by corporation to president in the amount of salary owed not intended as present payment of salary and hence not equivalent to cash); *Jay A. Williams v. Commissioner,* 28 T.C. 1000, 1002 (1957); *see also* Metzer *Constructive Receipt, Economic Benefit, and Assignment of Income,* 29 Tax L.Rev. at 554.

In this case, it is difficult to conceive Reed's contractual right to future payment, even though unconditional and evidenced by an escrow account, as a right which commonly and readily changes hands in commerce. *See Johnston,* 14 T.C. at 565 (cash basis taxpayer's contractual right to future payment of purchase proceeds, evidenced by the deposit of such proceeds into

---

**6.** "[U]nlike constructive receipt, economic benefit requires the actual receipt of property or the actual receipt of a right to receive property in the future, at which point, the doctrine asks whether the property or the right confers a present economic benefit with an ascertainable fair market value." Metzer, *Constructive Receipt, Economic Benefit, and Assignment of Income,* 29 Tax L.Rev. at 551.

**7.** "Courts stress that unless the 'equivalent to cash' test is maintained separate from the 'ascertainable fair market value' test, the distinc-

tion between the cash and accrual methods will be eliminated." Davies, *A Model for Corporate Income Tax,* at 321 n. 7; *see also* Midgley, *Federal Income Taxation of Private Annuitants,* 406 Geo.Wash.L.Rev. 679, 689 (1972).

**8.** *See* Metzer, *Constructive Receipt, Economic Benefit, and Assignment of Income,* 29 Tax L.Rev. at 553–554; McDonald, *Conceptual Astigmatism,* 24 Tax L.Rev. at 225; Midgley, *Federal Income Taxation of Private Annuitants,* 406 Geo.Wash.L.Rev. 670, 688–89 (1972).

an escrow account, not the equivalent of cash); *see also* Davies, *A Model for Corporate Income Tax,* 124 U.Pa.L.Rev. at 322. However, even assuming Reed's right to future payment of the escrowed proceeds was readily transferrable in commerce, the escrow account was not intended by the parties as present payment of the purchase price, but rather was intended to serve as an added assurance that payment would be made in the next year. As such, the escrow account cannot be characterized fairly as the equivalent of cash to Reed in 1973. We would have to ignore the distinction between cash and accrual methods of accounting to adopt a rule requiring immediate recognition of income by a cash basis taxpayer who has a contractual right to future payment from an escrow account, but who has received no present beneficial interest from that account. *See Johnston,* 14 T.C. at 565.

The Commissioner alternatively suggests that Reed received a present beneficial interest in the escrow funds in the sense that he could have assigned his right to receive payment under the agreement. This argument proves either too much or too little. It proves too much because any promisee under a contract for deferred payment could conceivably assign his right to receive future payment, provided the contract does not specifically include a non-assignment clause. Hence, to base the economic benefit rule on whether a taxpayer could have assigned his contractual right to future payment would eviscerate the well recognized rule that a taxpayer can defer income recognition pursuant to a bona fide deferred payment agreement. Furthermore, it proves too little in this case because Reed never attempted to make any assignment of his right to receive the escrow funds and thus did nothing to charge himself with any economic benefit to be derived from the funds. *See Oates,* 207 F.2d at 713 (taxpayer made no assignment of right to payment and hence received no economic benefit); *compare Helvering v. Horst,* 311 U.S. 112, 119–20, 61 S.Ct. 144, 148, 85 L.Ed. 75 (1940).

### C. Receipt of proceeds by taxpayer's agent.

The Commissioner's last argument, neither raised nor addressed in the Tax Court, is that the escrowee bank served as Reed's agent in receiving and holding the sales proceeds in 1973. The Commissioner cites cases recognizing the principle that receipt of proceeds by the seller's agent is tantamount to receipt by the principal. *Arnwine,* 696 F.2d at 1108; *Warren,* 613 F.2d at 593; *Williams,* 219 F.2d at 526–27. The Commissioner essentially contends that the escrowee bank must have been Reed's agent because the escrow device served only the benefit of the taxpayer, and the buyer Cvengros was essentially indifferent to the deferral device; hence, the escrow arrangement really amounted to a self-imposed limitation. The Commissioner accordingly heavily relies upon *Warren,* 613 F.2d at 593, where that court states: "a self-imposed limitation, not part of the sales transaction between the buyer and seller ... does not serve to change the general rule that receipt by an agent is receipt by the principal."

The Commissioner's argument here is closely tied to its constructive receipt argument and fails for the same reason. In all of the cases the Commissioner cites as holding that the escrowee served as the taxpayer's agent, the courts found dispositive that the deferral arrangement was unilaterally set up by the taxpayer-seller and was not part of any bona fide agreement with the buyer. *See Warren,* 613 F.2d at 593 (deferred payment agreement was between the seller-taxpayer and its selling-agent, the cotton gin, rather than between the seller and the buyer); *Arnwine,* 696 F.2d at 1108 ("the buyers were not privy to the deferral agreement and had not even been apprised of the fact that such an arrangement had been attempted."); *Williams,* 219 F.2d at 526–27 (escrow device was unilaterally set up by the taxpayer, and had no connection to the purchase-sale agreement).

By contrast, the escrow arrangement here was a product of a bona fide

modification to the purchase-sale agreement between the seller, Reed, and the buyer, Cvengros. The escrow agreement was in fact signed by both Reed and Cvengros. Hence, the purchaser Reed not only knew about but actively participated in the escrow agreement giving the escrowee the authority to hold the purchase proceeds until 1974. Further, the escrow agreement itself provided that the escrowee bank was acting on the behalf of both Reed and Cvengros.

Courts have generally recognized that an escrowee does not serve as a taxpayer's agent for income recognition purposes where, as in this case, the escrow arrangement is a valid one, under which the escrowee represents both the taxpayer-seller and the other party to the escrow agreement, i.e., the buyer. Metzer, *Constructive Receipt, Economic Benefit, and Assignment of Income,* 29 Tax L.Rev. at 548–49; *see Johnston* 14 T.C. 564–65 (escrowed sales proceeds not constructively received by the taxpayer where escrowee acted as agent for both purchaser and seller-taxpayer under the escrow agreement); *Commissioner v. Tyler,* 28 B.T.A. 367, 370–71 (1933), *aff'd* 72 F.2d 950 (3rd Cir.1934); *cf. Busby,* 679 F.2d at 50, 50 n. 6 (escrowee not acting as taxpayer-seller's agent for income recognition purposes where purchaser knew of escrow arrangement and approved the eventual payment of escrowed funds).

Furthermore, we cannot accept the Commissioner's argument that an agency relationship for income recognition purposes is established by the mere fact that the escrowed funds would eventually inure to the benefit of Reed. All escrow accounts set up under a deferred payment agreement ultimately inure to the benefit of the receiving party. Hence, if the Commissioner's argument were accepted, no bona fide agreement between the purchaser and seller calling for deferred payment through the use

of an escrow arrangement would be legally effective to postpone income recognition.

Thus, to establish an agency relationship between the escrowee and taxpayer, the Commissioner must show that the escrow device was set up unilaterally by the taxpayer or that the escrowee was functioning under the exclusive authority of the taxpayer. The Commissioner has failed to make such a showing here.

### D. Conclusion

We therefore conclude that a purchase-sale contract calling for deferred payment of the purchase price through the use of an escrow arrangement is effective to shift income recognition by the seller until the taxable year when he actually receives payment of purchase price, rather than when the purchase price is deposited into escrow, provided the following three conditions exist: (1) the escrow arrangement is part of a bona fide, arms-length agreement between the purchaser and seller calling for deferred payment; (2) the seller receives no present beneficial interest (e.g., investment income) from the purchase funds while they are in escrow; and (3) the escrowee is not acting under the exclusive authority of the taxpayer. Because all three conditions exist here, we reverse the Tax Court's ruling assessing a $71,412.28 deficiency in Reed's 1973 federal income tax.

*Judgment reversed.*